604 So.2d 92 (1992)
Dru Ann DeWOODY, Individually and as Natural Tutrix of the Minors, Caleb DeWoody and Jared DeWoody, Plaintiffs-Appellants,
v.
CITGO PETROLEUM CORPORATION and Fred Bruno, Defendants-Appellees.
No. 91-241.
Court of Appeal of Louisiana, Third Circuit.
June 24, 1992.
Writ Denied October 29, 1992.
*93 Jones, Jones & Alexander, J.B. Jones, Jr., Cameron, for plaintiff/appellant.
Plauche, Smith & Nieset, Charles V. Musso, Jr., Lake Charles, for American Cas., first appellant.
Jeansonne & Briney, Patrick J. Briney, Hartford, for appellee.
Thomas W. Sanders, Lake Charles, for Nelson Elec. and Travelers, appellees.
Jones, Tete, Nolen, Hanchey, Swift & Spears, Charles N. Harper, Lake Charles, for Citgo, appellee.
Before GUIDRY and YELVERTON, JJ., and COREIL[*], J. Pro Tem.
YELVERTON, Judge.
Stephen DeWoody, 32, an electrician employed by Lake Charles Electric Company, was electrocuted on February 5, 1988, while working inside the Citgo Refinery near Lake Charles, Louisiana. He was survived by his widow and two young sons. Dru Ann DeWoody, individually and as natural tutrix of the minors, sued Citgo Petroleum Corporation and Fred Bruno, one of its employees, for damages for the loss of their husband and father. The case was tried by a jury. The trial judge submitted the case to the jury on a special verdict form consisting of 12 interrogatories. Responding, the jury found that Citgo was negligent, and that its negligence was the legal cause of the death of Stephen DeWoody. It found that Lake Charles Electric Company and its employees were not negligent. It found that the equipment on which DeWoody was working was manufactured by Nelson Electric Company, that the equipment was defective in design, and that the defective design was a legal cause of DeWoody's death. Concomitantly, it found that the motor starter (the equipment) owned by Citgo was defective and that the defect was a legal cause of the electrocution. It found that DeWoody was not contributorily negligent. It assigned percentages of fault of 77% to Citgo and Bruno, and 23% to Nelson Electric. It awarded damages sustained by the deceased from the moment of the accident until his death in the amount of $27,000. It made a finding of damages sustained by the three survivors for loss of support, past and future, in the amount of $400,000. It gave special damages to Dru Ann DeWoody of $29,000. It awarded Jared DeWoody, one of the boys, $175,000, for loss of love, grief and sorrow, and loss of nurture, training, education and guidance, and it made a like award to Caleb, the other son. Then, answering Question No. 12, the last interrogatory on the special verdict form, it marked "Yes" to the inquiry: "Was Citgo Petroleum Corporation the statutory employer of Stephen DeWoody?" The effect of this last answer was a judgment in favor of Citgo dismissing the plaintiff's suit.
The plaintiff, joined by American Casualty Company of Reading, Pennsylvania, Lake Charles Electric's worker's compensation insurer, which had intervened in the case, moved for a judgment notwithstanding the verdict as to the statutory employer finding. The motion was denied and the *94 plaintiff and American Casualty Company have appealed.
The main issue on appeal is the jury's finding that DeWoody was the statutory employee of Citgo. No issue is raised by any party concerning the jury's findings as to the other 11 interrogatories. The plaintiff assigns error in the framing of the jury interrogatories and the jury instructions. An exception of peremption was filed by both the plaintiffs and the intervenor, pleading that Citgo's third-party claim against Nelson Electric was perempted. This exception was overruled by the trial judge and that ruling is also an issue on appeal. We will discuss these issues after first narrating the basic facts.

FACTS
Lake Charles Electric was under a written contract with Citgo to perform electrical and instrumentation work for Citgo at its oil refinery near Lake Charles. DeWoody and his foreman, James Manuel, employees of Lake Charles Electric, were assigned on February 1, 1988, to motor starter testing in substation 32 at the plant. On February 5, DeWoody was working on a Nelson 4,160-volt motor starter designated J-284-C. He was inside the cubicle removing some bolts when his wrench came in contact with an energized part, and he was electrocuted.
The mechanics of the accident, and that a design defect in Citgo's equipment being worked on was a cause-in-fact of it happening, are facts that are not disputed on appeal. The defect in this J-284-C, the only one of its kind in the plant, was that when the shutter fell down it did not isolate the energized parts, but instead left them exposed to accidental contact by the electrician doing maintenance on the equipment. In this respect this piece of equipment differed from the standard of the industry, and this difference constituted the defect in design. Frederick Brooks, a consulting electrical engineer testifying for Citgo at the trial, explained that there is an important difference between electrical power equipment that can be maintained in an energized state, as opposed to equipment that has to be completely shut off in order to be maintained. The difference is a matter of cost. He explained that it is too expensive to shut down an oil refinery to maintain a piece of electrical equipment, and so the equipment has to be built so that it can be safely maintained while in operation. This particular piece of equipment was not built so that it could be safely maintained while in operation. This accident would not have happened but for the improper design of this unit. George Green, the other expert in the case, also testified that this equipment was manufactured with a defectively designed shutter system, and that this was what caused DeWoody's death.

THE JURY CHARGES AND THE VERDICT SHEET
One of Citgo's defenses in the case was that it was the statutory employer of DeWoody.
In the jury charges, immediately following a short explanation of statutory employer law, the trial court charged the jury:
If you decide that the plaintiff has established the elements of her case by a preponderance of the evidence and the defendant has failed to establish a defense which would prevent plaintiff from recovering an award for her injuries, you must decide the question of whether plaintiff has sustained damage, and if so, the amount of that damage.
Although the jury was told that the statutory employer issue was a defense urged by Citgo, it was not told that a finding of statutory employment would prevent the plaintiff from recovering an award for her injuries. Nevertheless, the above quoted instruction clearly charged the jury that only after it found that the defendant had failed to establish a defense which would prevent plaintiff from recovering an award for her injuries, was it to decide the question of whether the plaintiff had sustained damage and the amount of that damage.
Inconsistently, the verdict sheet required the jury to consider damages before it considered the statutory employer defense to liability.
*95 The inconsistency between the above quoted instruction, and the placement of the statutory employer issue as the last interrogatory on the verdict sheet, was error. The plaintiff objected vigorously to the placement of this interrogatory last; she made a formal written request that it be placed first, along with the other defenses raised by Citgo. The trial court put it last, at Citgo's request. The only explanation in the record as to why the trial judge made the decision to place the issue last was his comment to the effect that he thought both sides wanted it last. Counsel for plaintiff renewed the objection, saying the plaintiff wanted it first. There was a discussion off the record, and we know nothing else about why the trial court made that decision.
Not only did the plaintiff object to the placement of the statutory employer defense last among the interrogatories, but her counsel also objected to the failure of the trial court to instruct the jury as to the consequences of its response to this interrogatory. The failure of the trial court to give the jury this essential instruction was error.
Throughout the charges the trial judge instructed the jury that the plaintiff could recover only if it found that Citgo was at fault. The judge explained contributory negligence, and the allocation of fault, and the consequences of such findings in reducing recovery. The court explained La.C.C. art. 2317, strict liability, and how Citgo, as the person in custody of the defective thing, could escape liability. In this connection the court explained how Nelson Electric, a non-party in plaintiff's case, could be found to have been at fault by a finding of unreasonably dangerous design. Never once, however, in the charges or on the verdict sheet, did the trial court explain to the jury the consequences of a finding that Stephen DeWoody was a statutory employee of Citgo. In other words, while the consequences of every interrogatory appearing on the verdict sheet was explained to the jury by the trial judge in the charges, the consequences of a finding as to the last interrogatorynow the most crucial issue in the casewas never mentioned.
The statutory employer defense was not even mentioned in the trial court's summary of its charges. Just before the jury was retired to deliberate, the judge told them:
This completes my remarks on the law applicable to this case. In summary, let me recall to you the essence of my remarks. The plaintiff has the burden of proving the following elements by a preponderance of the evidence. She must demonstrate:
(1) That the injury which she says she suffered was, in fact, caused by the conduct of the defendant; and
(2) That the conduct of the defendant was below the standards which I have told you are applicable to the defendant's conduct;
If you are satisfied that the plaintiff has established these two elements, then plaintiff is entitled to recover and you should return a verdict for the plaintiff, unless the defendant has proved by a preponderance of the evidence that Stephen DeWoody contributed to his own injury by his own substandard conduct. If, on the other hand, plaintiff has failed to establish these two elements, then you should return a verdict for defendant.
If you decide to return a verdict for plaintiff, then you will make an appropriate award according to the instructions which I have given you on the subject of damages.
The jury was then retired to deliberate on its verdict. Not surprisingly, twice during its over-five-hour deliberations the jury sent a note to the judge requesting more information about statutory employment, once at 3:40 p.m. and again at 7:45 p.m. Its last note read:
We need to have the charges to the jury regarding statuatory [sic] employment read to us again.
They reached their verdict a little while later. The minutes of court show that after the verdict was read, the jury was polled, and in the first polling 11 of 12 stated that that was their answer to interrogatory *96 No. 12, but on the individual poll, only 9 of 12 stated that that was their verdict.
We conclude that the jury instructions with regard to the statutory employer issue were inadequate and misleading, such as to preclude the jury from reaching a verdict on that issue based on the law and the facts. We will decide this issue de novo. Parrino v. Royal Ins. Co. of America, 484 So.2d 282 (La.App. 3rd Cir.1986).

STATUTORY EMPLOYER DEFENSE
The law applicable to this issue is as stated in Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986). The issue here is whether, under the Louisiana Worker's Compensation Laws, La.R.S. 23:1032 and 1061, Citgo, as principal, was insulated from tort liability for the death of DeWoody, an employee of Citgo's contractor, Lake Charles Electric. In other words, was Citgo the statutory employer of DeWoody. These sections of the worker's compensation law were amended by Acts 1989, No. 454, § 3, effective January 1, 1990, overruling Berry. The accident in this case happened on February 5, 1988. This circuit has held in two cases, Fountain v. Central La. Electric Co., Inc., 578 So.2d 236 (La.App. 3rd Cir.1991), writ denied 581 So.2d 707 (La.1991), and Young v. Lyons Petroleum, Inc., 598 So.2d 702 (La. App. 3rd Cir.1992) (Our Docket No. 90-1170, April 16, 1992), that the amending act should not be applied retroactively. Hence, Berry law controls our decision here.
Citgo had the burden of proof. Berry, supra at 939. Berry explained that a determination of whether a statutory employment relationship exists involves a threelevel analysis.
In the first level, the primary focus is on the scope of the contract work. "The specific task to which an individual employee is put should not be determinative of his coverage under the Act. Instead, the entire scope of the work contract must be considered." Lewis, [v. Exxon Corp., 441 So.2d 192 (La.1983)] supra, citing Malone, Principal's Liability for Workmen's Compensation to Employees of Contractors, 10 La.L.Rev. 25 (1949). The central question to be answered is whether the contract work is specialized or non-specialized. This of course is a question of fact, and courts should consider whether the contract work requires a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the contract field. If it is determined that the contract work is specialized per se, as a matter of law the work is not a part of the principal's trade, business or occupation, and the principal is not the statutory employer of the specialized contractor's employees. In this situation, "the purpose behind the rule is not violated and the reason for holding the principal directly liable in compensation exclusively does not come into play" because the contractor is an independent business enterprise, rather than a mere intermediary interposed to avoid compensation responsibility. Williams v. Shell Oil Co., 677 F.2d 506 (5th Cir.1982) (Tate, J. writing for the panel), citing 13 W. Malone & H. Johnson, La.Civil Law TreatiseWorker's Compensation, §§ 78, 126 (1980).
If it is determined that the contract work is non-specialty, then the inquiry shifts to a comparison of the principal's trade, business or occupation and the contract work to see if the latter can be considered a part of the principal's trade, business or occupation. The jurisprudence has forged several guidelines, in no way exhaustive, which can aid a court in resolving this factual issue:
(1) Is the contract work routine and customary? That is, is it regular and predictable? Nonrecurring or extraordinary constructions and repairs usually are outside the scope of the statute. On the other hand, general maintenance and repair work, which by their very nature allow the smooth and continued operation of the principal, are within the scope of coverage. Lewis, supra; Benson [v. Seagraves, 436 So.2d 525 (La.1983)], supra; Barnes [ v. Sun Oil Co., 362 So.2d 761 (La. 1983)], supra; Reeves v. Louisiana & *97 Arkansas Railway Co., 282 So.2d 503 (La.1973).
(2) Does the principal have the equipment and/or manpower capable of performing the contract work? This is a sub-species of the specialty inquiry, supra. Here the primary focus is on determining whether the contract work as relates to the principal is handled ordinarily through employees. Lewis, supra, citing 1C. A. Larson, The Law of Workmen's Compensation, § 49.12, at 9-41 (1982).
(3) What is the practice in the industry relative to the contract work? Do industry participants normally contract out this type of work or do they have their own employees perform the work? See Reeves, supra; Brown v. Kaiser Aluminum and Chemical Corp., 289 So.2d 524 (La.App. 1st Cir. 1973), writ not considered 293 So.2d 171 (La.1974); Malone & Johnson, supra, § 126, pp. 252-53, fn. 91.
These guidelines are not absolute or rigid, but are instead to be applied relatively, taking into consideration the size, complexity, integration (either horizontal or vertical), or the lack thereof, etc. of the principal. What may be nonrecurring to a small concern, may for an industry giant be regular. Similarly while the type of contract work may be nonspecialized (i.e. manual labor), for a small concern it may well be beyond the expertise or capability of its employees. 1 A. Larson, Workmen's Compensation for Occupational Injuries and Death, § 49.13 (Desk ed. 1985). Basically, the factors developed by the jurisprudence strive to answer the overriding question of "whether [the contract work] is, in that business, normally carried on through employees rather than independent contractors." Id. (emphasis added)
Lastly, the court must determine if the principal is engaged in the work at the time of the alleged accident. La.R.S. 23:1032. At this level "[i]t is irrelevant that the principal has the financial resources or expertise to enter into a particular trade, business or occupation. In order for any person to come within the scope of the statute, he must be engaged in the enterprise at the time of the injury." Lewis, supra.

Applying this law to the facts of this case, we begin by inquiring whether Citgo proved the first of its analytic hurdles, that the electrical and instrumentation work that Lake Charles Electric contracted to perform was not specialized work. The evidence shows that Manuel and DeWoody learned to be electricians by going through apprenticeship programs with their union. In addition, they were given a special course in starter maintenance and relay testing at Citgo. Bruno testified that this additional training was done to give the electricians the skills needed to perform the work. It is clear from the evidence that the work being performed by Manuel and DeWoody required a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the electrical and instrumentation field.
Citgo presented no evidence defining the scope of the electrical and instrumentation work to be performed by Lake Charles Electric under its contract. Its defense was that Lake Charles Electric employees performed routine maintenance requiring no special skills. Nevertheless, the specific work being done by DeWoody on the day of his death involved the disconnection and reconnection of motor leads on equipment energized by 4,160 volts of electricity in order to visually and mechanically function test motor starter overloads. Equipment of this voltage and configuration had never before been worked upon by anyone at Citgo. The unit had been in existence since early in the 1970s, but the type of work being done on February 5, 1988, had never been done since the unit's installation. Although Citgo maintained that it had employees who could have done that same work, the fact is, after DeWoody was killed, Citgo chose to call in a high voltage systems specialist, Greg Bergeron of Dashiell Corporation (another contractor), rather than use its own people to complete the job that DeWoody had begun. The evidence demonstrated that 80% of the time during *98 the year preceding the accident the work of Manuel and DeWoody was on jobs requiring skills exceeding those of a journeyman electrician. Citgo failed to prove that the Lake Charles Electric work was simply regular electrical maintenance work of a kind that could be described as nonspecialized.
Although we hold that the work of Lake Charles Electric was specialized per se, and that, therefore, as a matter of law, Citgo was not the statutory employer of DeWoody, we will complete the analysis, as did the Supreme Court in Berry, by assuming that the electrical work done by DeWoody was a non-specialty field. If this is assumed, our decision would be no different.
Their work was not a part of Citgo's trade, business, or occupation. Citgo's business was making gasoline and other petroleum by-products, not the electrical testing business.
Before 1984, most of the work at the refinery was performed by Citgo employees. In that year a massive layoff occurred, following which Citgo decided to utilize contract employees rather than increase its number of permanent employees. Thereafter, it did not employ sufficient employees to do all of its work. It employed 70 to 75 permanent employees, known as Group 3, to take care of routine instrumentation and electrical maintenance. It budgeted 18 contract electricians on a daily basis. During the week of this accident, approximately 30 contract electricians were working. Thus, the evidence shows that Citgo purposely hired contract electricians because it did not have enough of its own employees to perform this work and do the other maintenance work at the plant.
The evidence further shows that the work being done on substation 32 was extraordinary, unusual, and not of a type ordinarily handled by Citgo employees. No one had ever worked on this particular unit, the J-284-C in substation 32. Also, there was no other 4,160-volt starter with the same configuration in the plant. Only one other record of work being performed on a starter with this voltage but of different configuration was introduced by Citgo and that was concerning work performed more than three years before this incident occurred.
Citgo failed to prove that it had the manpower capable of performing the contract work. Here the focus is on determining whether the contract work as relates to the principal is handled ordinarily through employees. Berry, supra. The evidence showed that during the week of this accident only half of Citgo's Group 3 employees were electricians. There were more Lake Charles Electric people at work during that week than there were electricians employed by Citgo. Even if motor starter testing work was all that Lake Charles Electric was contracted to do, Citgo's evidence shows that only 12 of the 70 to 75 employees in Group 3 did motor starter testing work from 1984 to 1988, only one Citgo employee worked on a 4,160-volt piece of equipment and that was more than three years before this accident, no Citgo employee ever worked on the same type of motor, and only two Citgo employees did such work in the year preceding this accident.
There was no evidence introduced as to whether industry participants normally contract out this type of work or had their own employees perform the work.
We conclude that Citgo failed in this case to meet its burden of proof to show that it was the statutory employer of DeWoody.

 CLAIM OF CITGO AGAINST NELSON ELECTRIC
One final issue needs to be determined, and that is whether the third-party claim against Nelson Electric is perempted. As pointed out earlier, the jury allocated fault in the amount of 77% to Citgo and/or Bruno, and 23% to Nelson Electric, the manufacturer of this J-284-C. It was stipulated at the trial that this unit was manufactured by Nelson Electric Company, a division of General Signal Corporation, and sold to Industrial Supply Company, which in turn sold and delivered it to Citgo in 1971, the year that it was installed at the *99 refinery. Asserting that there was a design defect in this unit which was the cause of this accident, Citgo filed a third-party demand against Nelson Electric Company. Although the plaintiff settled with Nelson Electric, Citgo's third-party demand based on indemnity is apparently still alive. The interests of the plaintiff and the intervenor in filing the exception of peremption was to defeat the third-party demand and get an allocation of 100% fault against Citgo, instead of 77%.
The trial judge overruled the exception, and this ruling is the last assignment of error urged by the appellants. Plaintiff and intervenor take the position that the third-party claims asserted by Citgo and Bruno against Nelson Electric are perempted by La.R.S. 9:2772.
The trial court was correct in overruling the exception of peremption. To be entitled to the benefits of La.R.S. 9:2772, it was not enough that it be shown that the equipment manufactured by Nelson Electric ultimately became an improvement to immovable property. The exceptors had also to prove that the equipment was "construction or the construction of an improvement to immovable property", in the words of the statute. This means that in the construction it must be shown that Nelson Electric was a contractor. Tenneco Oil Co. v. Chicago Bridge & Iron Co., 495 So.2d 1317 (La.App. 4th Cir.1986), writ denied 497 So.2d 1015 (La.1986); Bunge Corp. v. GATX Corp., 557 So.2d 1376 (La. 1990). The statute applies only to contracts to build, and not to contracts of sale.
For the reasons expressed above, the judgment of the trial court which dismissed the plaintiff's case based on the verdict of the jury as to interrogatory No. 12, is reversed and set aside. Judgment is now rendered in favor of the plaintiff, individually and in her capacity as natural tutrix of the minors, against Citgo Petroleum Corporation and Fred Bruno, in the respective amounts awarded by the jury, with interest from judicial demand.
La.C.C.P. art. 1812 C(2) provides that the special verdict may inquire into whether another person, whether party or not, was at fault, and if so, whether that fault was a legal cause of the damages and the degree of that fault expressed in percentage. The jury in this case made the finding that Nelson Electric was 23% at fault. La. C.C.P. art. 1812 D requires that the court enter a judgment in conformity with the jury's answers to the special questions and according to applicable law. Accordingly, the judgment against Citgo and Bruno, which we render herein, is ordered reduced by the amount of Nelson Electric's fault percentage or 23%.
Citgo and Bruno will pay all costs of the trial below and on this appeal.
JUDGMENT REVERSED IN PART; AFFIRMED IN PART; RENDERED.
NOTES
[*] Honorable Joseph E. Coreil, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.