JACHARLES R. JONES, Judge.
The Appellants, Rebecca J. Labat, individually and on behalf of her minor children, Megan Scott and Tiffany Scott, appeal the district court’s judgment dismissing their demands against the Appel-lee, Mallard Bay Drilling, Inc. This case is a wrongful death survival action arising out of the death of Robert Labat, a Jones Act seaman. The district court found that Mallard Bay Drilling, Inc. was not responsible for causing or worsening Mr. Labat’s condition and that Mallard Bay Drilling, Inc. did not unfairly or improperly withhold or fail to provide proper maintenance and cure to its seaman *919 employee, Mr. Labat. It is from this judgment the Appellants seek our review. Following a review of the record, we reverse and remand this case to the district court.
Facts
On December 19, 1999, Robert Labat was employed by Mallard Bay Drilling, Inc. (hereinafter “Mallard Bay”) as a derrick hand. Mr. Labat was working aboard the Mallard Rig 17, a vessel that was situated in Lake Washington on a Phillip’s Petroleum well. The site was approximately a 30-45 minute boat ride 1 ¡.to Phillip’s dock in Port Sulpher, Louisiana. There was no helicopter service. The only medical personnel aboard were the drillers and the toolpushers who are trained in first aid, but they are not doctors.
Mr. Labat became sick and threw up while working under his driller, Rickey Miller and reported his illness to Mr. Miller. Mr. Miller advised Mr. Labat to report his condition to the toolpusher, Frank Guidry, and Mr. Labat complied. Mr. La-bat finished his work on the derrick, ate dinner and went to sleep. The next day, on December 20th, Mr. Labat reported to Mr. Miller that he had thrown up again and Mr. Labat requested that he be taken to shore. Mr. Miller told Mr. Labat to report his illness to the toolpusher, who at the time was Ronald Savoie. Mr. Labat reported to Mr. Savoie and filled out an illness report. The illness report indicated that Mr. Labat had severe headaches, nausea, fever and perhaps the flu. Per Mr. Savoie’s instruction and with the consent of Mr. Labat, Mr. Labat got onto a crew boat and headed to the dock in Port Sul-pher. When Mr. Labat got to shore, he reported to Mr. Savoie that he was too ill to drive to his home in Mobile, Alabama. Mr. Savoie called Mr. Labat’s wife who indicated that she was unavailable to pick up her husband for another five hours. Mr. Labat returned to the rig on the crew boat and upon his return he was isolated.
When Mr. Miller went to retrieve Mr. Labat so that he could be brought back to shore to meet his wife, Mr. Miller discovered Mr. Labat naked and having convulsions. Mr. Labat was put back onto the crew boat and brought to shore at which time he was transported by ambulance to the Plaquemines Parish Comprehensive Care Center. He was subsequently transferred to Meadowcrest Hospital where he was diagnosed with bacterial meningitis. Mr. Labat died seven days later.
1 a Argument
The record reflects that both parties stipulated at trial that Mr. Labat was indeed a Jones Act employee and that Mallard Bay had a duty to see to it that he was treated for his condition. The issue reviewed by this court is whether Mallard Bay caused and/or worsened Mr. Labat’s condition in its failure to provide proper medical attention to Mr. Labat. We find that this is properly addressed under the broad doctrine of maintenance and cure.
Maintenance and Cure
Mrs. Labat contends that the obligation of maintenance and cure apply not only when a seaman is injured but also when a seaman becomes ill. She furthers her argument by maintaining that the district court’s initial finding that Mallard Bay was not responsible for “causing” La-bat’s illness is irrelevant to the issue of duty of maintenance and cure. This court in Porche v. Maritime Overseas Corporation, et al., 550 So.2d 278, 279 (La.App. 4th Cir.1989), found that “[w]hen a seaman becomes ill or injured while in the service of his ship, the ship owner must pay him maintenance and cure, whether or not the ship owner was at fault or the ship unsea-worthy .... ” (emphasis added). Although Porche focuses on the obligation to pay medical expenses via maintenance and *920 cure, we reference this case in support of Mrs. Labat’s claim that not only does a shipowner have a duty to its employees who are injured, but also to those who become ill.
Mallard Bay relies on Gautreaux v. Scurlock Marine Inc., 107 F.3d 331(5th Cir.1997) whereby the court found that both the employer and the seaman/employee are bound by a standard of ordinary prudence and that no person’s duty of care is higher or lesser than another’s, meaning that they owed no 1¿more of a duty to Mr. Labat than Mr. Labat owed to himself to request medical attention once realizing the severity of his illness. Mallard Bay argues that Mr. Labat was of sound mind and that any decisions made as far as how his condition was to be handled were per his instructions. They further aver that once Mr. Labat was in a state that required immediate medical attention, Mallard Bay provided him with such attention. We disagree.
According to George v. Chesapeake & Ohio Railroad Company, 348 F.Supp. 283 (1972), the only defense to maintenance and cure is willful misconduct. The two elements of willful misconduct are (1) that the employer must offer medical care and treatment and (2) that the seaman must then “voluntarily” and unreasonably reject the medical treatment. The record does not reflect that Mr. Labat was ever offered medical treatment from Mallard Bay employees to refuse it. Mr. Savoie testified that once Mr. Labat was brought to shore the first time, it was upon the suggestion of Mr. Savoie that Mr. La-bat return to the ship so that he could sleep while Mr. Labat waited for his wife. He also testified that although he was aware that Mr. Labat’s condition was worsening, he proceeded to bring him to the ship where there was no medical examiner and that he did not feel that it was necessary to monitor Mr. Labat’s condition once Mr. Labat was isolated on the vessel upon his return. Mr. Savoie maintains that he only followed Mr. Labat’s instructions.
Although Mallard Bay contends that Mr. Labat was of sound mind to make reasonable decisions, Mr. Labat was not medically evaluated to make such a conclusion. The mere fact that he was subsequently diagnosed with meningitis as opposed to the flu is proof of Mr. Labat’s deteriorating condition both physically and mentally.
| sDr. Mark P. Workman testified that had Mr. Labat been hospitalized earlier it is possible that his condition may not have worsened. He further agreed that having Mr. Labat evaluated by a doctor when he initially was brought to shore would have been “reasonable”. Although Dr. Workman testified that a case-by-case analysis is required when determining how quickly or how slowly meningitis may set in after flu-like symptoms occur, he agreed that when Mr. Labat was having convulsions he should have been hospitalized. However, we find that it would be outrageous to suggest that a seaman who is 30-45 minutes away from a medical facility has to be naked and convulsing before his employer finds medical treatment necessary and immediate.
Mr. Savoie testified that as a toolpusher, trained in first aid, he never took Mr. Labat’s temperature. He further stated that he is trained in fractures and “stuff like that for accidents” and that he didn’t think that taking Mr. Labat’s temperature was necessary because, “I went by what he (Mr. Labat) was telling me, I mean, I knew he had the flu already, so he was going in (to shore). He told me that he had the flu, so I was sending him to the doctor”. The district court erred in finding that Mallard Bay was not responsible for Mr. Labat’s condition worsening because under the duty of maintenance and *921 cure Mallard Bay had a duty to provide medical treatment to Mr. Labat at a more reasonable time.
Mrs. Labat further blames Mallard Bay for the death of her husband because of Mallard Bay’s failure to have a written corporate policy addressing what workers should do when workers become ill. She insists that Mallard Bay violated the American Petroleum Institute (API) Standards. She also suggests that Mallard Bay clearly treats injuries different from illnesses and leaves the decision for medical treatment solely up to the seaman which is an unfair practice.
| (¡Mallard Bay argues that the API Standards have not been adopted by the United States Coast Guard and serves only as recommendations and suggestions to vessel owners. It also maintains that Mrs. Labat failed to prove that the vessel was unseaworthy.
Both parties support their positions based solely upon the testimony at trial. Since we determined that the district court erred in finding that Mallard Bay was not responsible for causing or worsening La-bat’s condition, it would only be logical to conclude that the district court also erred in finding that Mallard Bay did not unfairly or improperly withhold or fail to provide proper maintenance and cure to Mr. La-bat.
Ed Roberts, Mrs. Labat’s expert witness at trial who was qualified by the district court to give testimony as to the customary health practices on offshore rigs, testified that when a worker such as Mr. Labat fills out an illness report, that report constitutes notice to his supervisor that the worker has become ill and sick necessitating medical treatment. He further testified that when the worker fills out such a report, the second portion of the API Standards concerning illness aboard rigs requires that “the supervisor shall arrange any necessary medical and first aid treatment”. Unfortunately, Mallard Bay has no specific corporate policy addressing workers who become ill in the service of the vessel and its safety manual makes no mention of any policies, procedures, or guidelines pertaining to illnesses that occur in the service of the vessel. We refuse Mallard Bay’s argument that when a seaman becomes ill it is entirely up to that seaman to seek medical attention on his own without the suggestion or offering by his supervisors.
In accordance with Porche, Mallard Bay owed Mr. Labat the duty of maintenance and cure as an employee aboard its vessel whether injured or ill. The | failure of Mallard Bay to reasonably assess Mr. La-bat’s condition and to allow his condition to manifest while under their care and control gives rise to Mallard Bay’s responsibility to Mr. Labat’s survivors.
Damages
Mrs. Labat seeks wrongful death damages for pre-death pain and suffering, the present value of future earnings after deduction for consumption, the present value of household services and the loss of guidance and support. Mallard Bay proposes that if we find that there was error by the district court on the issues of liability and causation, Mrs. Labat’s damages should be limited strictly to economic loss and loss of household services.
Pre-death pain and suffering
A plaintiff seeking to recover for his decedent’s pain and suffering must prove, by a preponderance of the evidence, that the decedent was conscious after realizing his danger. Snyder v. Whittaker Corp., 839 F.2d 1085 (5th Cir.1988), citing Deal v. A.P. Bell Fish Co., 728 F.2d 717, 718 (5th Cir.1984) (Jones Act drowning case); Davis v. Parkhill-Goodloe Co., 302 F.2d 489, 495 (5th Cir.1962) (Jones Act *922 drowning case); Thompson v. Offshore Co., 440 F.Supp. 752, 761 (S.D.Tex.1977) (Jones Act and general maritime law); Haley v. Pan American World Airways, 746 F.2d 311, 315 (5th Cir.1984) (same test under Louisiana law).
Mallard Bay contends that Mr. La-bat never regained consciousness after falling asleep in the isolated area aboard the vessel and therefore case law does not support the reward of pre-death pain and suffering damages. However, the record indicates that once Mr. Labat was taken to the Plaquemines Comprehensive Care Center, he was in so much pain that he had to be physically retrained and given pain medication. Mrs. Labat testified that Mr. Labat was foaming at the mouth, that | «his eyes were rolling back into his head and that he was moaning while fluid was being sucked out of his lungs. She further testified that he became agitated while hospitalized and attempted to get out of bed while being restrained. Mrs. Labat testified that while caring for her husband, he moved his toes after she tickled his feet. Mr. Labat died seven days after being taken off of the vessel and transported to the hospital. The evidence is overwhelming that Mr. Labat physically suffered and for that reason, Mrs. Labat must be compensated.
Damages for victim’s pain and suffering prior to his death are properly awarded in survival action, if there is even a scintilla of evidence of any suffering or pain on part of victim by his actions or otherwise. Ronald E. Prince, et al. v. A.J. Mattalino, M.D., et al., 583 So.2d 541 (La.App. 3rd Cir.6/26/91). The trial court did not abuse its discretion in awarding $50,000 for captain’s pain and suffering prior to death by drowning in Wall v. Progressive Barge Line, Inc., et al, 97-0665 (La.App. 4 Cir. 10/29/97) 703 So.2d 681. However, we support the award of $400,000 in damages for Mr. Labat’s pain and suffering in accordance with Easton v. Chevron Industries, Inc., et al., 602 So.2d 1032 (La.App. 4 Cir.1992), where Ms. Ea-ston suffered from multiple broken ribs and survived for two hours after being hit by a crane. In assessing quantum for a decedent’s pre-death pain and suffering, the Court must consider both the severity and duration of the injury proceeding death, Id at 1032.
Our research unveils no case law parallel to the case at bar. There is no instance whereby a seaman died of a contracted disease thus triggering maintenance and cure on behalf of his employer. There is no instance whereby a family was awarded wrongful death damages due to the death of another family member having contracted bacterial meningitis. The most analogous cases involve Rseamen injured while in the course and scope of their duties as a Jones Act seaman. Therefore, when determining damages in this matter, we recognize the importance of setting a precedent for future cases with similar circumstances. We find that the record supports that '$400,000 is the appropriate award for pre-death pain and suffering considering Mrs. Labat’s testimony of her husband’s long term pain and suffering for seven days after being hospitalized coupled with the damages awarded in Wall.
Future earnings
At trial, two expert witnesses testified as to the economic loss suffered by Mrs. Labat as a result of her husband’s death. Dr. G. Richard Thompson testified on behalf of Mrs. Labat and Dr. Kenneth Boudreaux testified on behalf of Mallard Bay. The two analyses are similar in that both economists used net after tax dollars and both economists calculated the net loss after deducting the consumption of Mr. *923 Labat. However, the ultimate figures of both economists are substantially different.
After a de novo review of both expert’s testimony and the evidence, we adopt Dr. Thompson’s calculation as to the economic loss suffered by Mrs. Labat. In Culver v. Slater Boat Co., 688 F.2d 280, 301 (5th Cir.1982) the court made it clear that likely promotions and other issues pertaining to increased productivity should be calculated into projections on future income loss. Dr. Thompson’s calculations used Mr. Labat’s last year’s income prior to his death as the basis for starting income. Dr. Thompson selected this figure as Mr. Labat’s starting salary because this is what Mr. Labat was making at the time of his death. When calculating the amount of personal consumption, Dr. Thompson took into consideration that Mr. Labat’s two small children were solely dependent upon his income, which is apparent in the tax returns admitted into evidence. Dr. Thompson |10took a 1.55% annual productivity increase considering that Mr. Labat had recently obtained the promotion to derrick hand and had the potential to receive future promotions. As in Culver, Dr. Thompson looked at the annual inflationary rates for the previous 27 years, both high and low, in calculating the total.
For the reasons assigned above, we find that Dr. Thompson’s calculations with respect to the loss of income sustained as a result of Mr. Labat’s death, is an accurate calculation and therefore the award for economic loss in the amount of $655,833 is reasonable.
Household services
In addition to loss of income, Dr. Thompson made a calculation of household services. Since we find that Dr. Thompson reasonably calculated Mr. La-bat’s economic loss, we find no reason to reject his calculation of household services. It was uncontested that Mr. Labat contributed a minimum of three hours per day to household services when he was not working off shore. Dr. Thompson applied a minimum wage value and Mr. Labat’s life expectancy thus totaling $146,877. However, we do find that Mrs. Labat is capable of performing some of the tasks that Mr. Labat preformed at home. Therefore we find it reasonable to reduce Dr. Thompson’s calculation by 30% taking into account that the children can assist in the household services; thus deducting 10% per each person in the Labat home for a total $102,813.90. “Louisiana law allows, as an element of damages, reasonable housekeeping expenses necessitated by the incapacity of an injured spouse”. Maranto v. Goodyear Tire & Rubber Co., 25,114 (La.App. 2 Cir. 5/10/95), 661 So.2d 503.
Mrs. Maranto’s husband and children had to take over many of her normal household activities after the accident. In Maranto, Dr. Harju calculated lost Inhousehold services based upon 20.1 hours per week at $5 per hour for a total of $200,171. The second circuit reduced the award to $25,000 for loss of household services because Mrs. Maranto could and did perform some of the tasks. In Maran-to the appellate court’s award for past and future household services was based upon Dr. Harju’s calculations for ten hours of household services per week (half the number used in Maranto, times the minimum wage). Robbins, et al. v. State of Louisiana through the Department of Labor, 31590 (La.App. 2 Cir. 2/24/99), 728 So.2d 991 at 998.
The award of $102,813.90 for Mrs. La-bat’s loss of household services is reasonable and consistent with the evidence.
Loss of guidance and support
In the seminal decision of Michigan Central R.R. v. Vreeland, 227 U.S. 59, 33 S.Ct. 192, 57 L.Ed. 417 (1913), the *924 United States Supreme Court specifically held that a spouse was entitled to a loss of guidance and support as a part of pecuniary loss under a maritime wrongful death claim. Mrs. Labat testified that Mr. La-bat not only contributed financially but brought guidance and structure to her and her children’s life. In accordance with DeWoody v. Citgo Petroleum Corp., 604 So.2d 92 (La.App. 3 Cir.1992), the court made a finding of damages sustained by the three survivors for loss of support, past and future, in the amount of $400,000. Therefore, the award of $200,000 requested in Mrs. Labat’s original petition is well within reason.
Total damages:
In light of the testimony and evidence presented, we find that the wrongful death damages to be awarded to Mrs. Labat in this matter are as follows:
LaPre-death pain and suffering $ 400,000
Future earnings $ 666,833
Loss of guidance and support $ 200,000
Total damages: $1,255,833
Decree
After careful review of the record, we find that the district court erred in dismissing Mrs. Labat’s claim finding that Mallard Bay did not unfairly or improperly withhold or fail to provide proper medical maintenance and cure to Mr. Labat. Thus, for the reasons herein assigned, we reverse the judgment of the district court and render an award for pre-death pain and suffering, future loss of earnings and loss of guidance and support in the amount of $1,255,833 in favor of Mrs. Labat.

REVERSED AND RENDERED.