**UNITED STATES COURT OF APPEALS**

**For the Fifth Circuit**

No. 99-30216

CLAUDE SWOPE; SANDRA K. SWOPE,

Plaintiffs - Appellants,

VERSUS

COLUMBIAN CHEMICALS CO.; ET AL

Defendants,

COLUMBIAN CHEMICALS CO.; HENKEL CORP.; MILLENNIUM PETROCHEMICALS
INC., formerly known as National Distillers & Chemical Corp.,
also known as Quantum Chemicals Corp.

Defendants - Appellees.

Appeals from the United States District Court
for the Western District of Louisiana

January 24, 2002

Before JOLLY and DENNIS, Circuit Judges, and DOWD,[*] District Judge.

DENNIS, Circuit Judge, and DOWD, District Judge[**]:

Mr. Claude Swope and his wife brought this suit alleging that

---

[*] The Honorable David D. Dowd, Jr., United States District
Judge for the Northern District of Ohio, sitting by designation.

[**] Part I of this opinion was written by Judge Dowd.

1

he was rendered totally and permanently disabled by lung damage caused through his inhalation of ozone during his employment as a maintenance worker by Columbian Chemicals Company ("Columbian"). Columbian is in the business of manufacturing carbon black with a process that involves the use of ozone. Columbian purchased and operated ozone generators manufactured by Emery Industries, Inc. ("Emery"). Henkel Corporation/Millennium Petrochemicals, Inc., ("Henkel") is Emery's successor corporation and subject to liability for harm to persons caused by Emery's defective products.

Under the Swopes' allegations of facts, Mr. Swope's lung damage resulted from hazardous characteristics of the Emery ozone generators which made them unreasonably dangerous in design and unreasonably dangerous for lack of an adequate warning of those hazards. The Swopes allege that Columbian knew to a substantial certainty that its continual exposures of Mr. Swope to harmful amounts of ozone without providing him with any respiratory protection would cause repeated damage to his lungs. Accordingly, the Swopes sued for damages against Henkel under allegations raising products liability theories and against Columbian for intentional torts or batteries. The district court granted motions for summary judgment by Columbian and Henkel rejecting all of the Swopes' claims, except that their products liability claim for design defect was dismissed voluntarily without prejudice to its refiling in the event of reversal of the summary judgment in favor

2

of Henkel on appeal.

The questions raised by the Swopes' appeal from the district court's summary judgments against them are: (1) Does this court have appellate jurisdiction? (2) If so, can the Swopes' tort action against Columbian survive a motion for summary judgment because of a genuine dispute as to whether Columbian's intentional tort of battery caused Swope's lung damage?  (3) Is the Swopes' products liability action against Henkel time-barred under Louisiana Revised Statute § 9:2772 because Emery, the manufacturer of the ozone generators, performed a "construction of an improvement to immovable property"?  (4) If the Swopes' product liability action is not time barred under Louisiana Revised Statute § 9:2772, can it survive a motion for summary judgment because Henkel failed to carry its burden of showing that Columbian knew or reasonably should have been expected to know of the dangerous characteristic of the Emery generator that caused damage to Mr. Swope?

After reviewing the defendants' motions for summary judgment de novo, we reverse and remand the case for further proceedings.

## I.  JURISDICTION

On February 8, 1999, the district court entered an order granting summary judgment to, and dismissing all claims against, Columbian.  On February 17, 1999, plaintiffs filed both a notice of appeal from the district court's February 8 ruling and a motion to designate the February 8 order in favor of Columbian as final under Federal Rule of Civil Procedure 54(b).  On February

3

22, 1999, the trial court entered partial summary judgment in favor of defendant Henkel, and dismissed all claims against Henkel except for plaintiffs' claim for defective design. The same day, the district court denied the Swopes' Rule 54(b) motion to designate the court's February 8 ruling as final.

On April 23, 1999, plaintiffs filed a "Rule 41(a)" stipulated motion to dismiss the remaining claim against Henkel and a motion to designate both the February 8 and the February 22 orders granting summary judgment as final pursuant to Fed. R. Civ. P. 54(b). The plaintiffs also filed a second notice of appeal on both grants of summary judgment. The plaintiffs' stipulated motion to dismiss was qualified. The dismissal was to be with prejudice if the trial court's summary judgment ruling in favor of Henkel was affirmed on appeal, and without prejudice if the district court was reversed. On May 3, 1999, the district court entered an order dismissing without prejudice the remaining claim against Henkel.[1] Also on that day, the district court granted plaintiffs' second Rule 54(b) motion and expressly designated the February 8 and February 22 summary judgment

---

[1] The order reads, in its entirety, "It is hereby ordered, pursuant to the foregoing Motion to Dismiss Without Prejudice, that the remaining claim of complainants against Henkel Corporation and Millennium Petrochemicals, Inc., be dismissed without prejudice." The order did not refer to the qualified nature of the parties' stipulated motion.

rulings as final judgments.[2]

On appeal, Columbian filed a motion to dismiss for lack of appellate jurisdiction, arguing that appellate jurisdiction is defective because appellants' notice of appeal preceded the trial court's designation of its summary judgment decisions as final. Henkel has filed a motion making essentially the same arguments. The Swopes have filed memoranda in opposition, and Henkel has replied.

This Court's jurisdiction is limited by 28 U.S.C. § 1291, which authorizes appeals from "final decisions of the district courts." Hence, as a general rule, all claims and issues in a case must be adjudicated before appeal, and a notice of appeal is effective only if it is from a final order or judgment. There are exceptions, of course, and one such exception is found in St. Paul Mercury Insurance Co. v. Fair Grounds Corp.[3] In that case, this Circuit held that "a premature notice of appeal is effective if Rule 54(b) certification is subsequently granted."[4] Here, the Swopes filed a notice of appeal at the same time they filed for Rule 54(b) certification. Since the Swopes' Rule 54(b) motion

---

[2] The order reads, in its entirety, "It is hereby ordered that the Memorandum Rulings issued on February 8, 1999 and February 22, 1999, be and are hereby rendered as final judgments pursuant to the Federal Rule of Civil Procedure 54(b), thereby allowing Complainants the opportunity to appeal the rulings with the United States Fifth Circuit Court of Appeal."

[3] 123 F.3d 336 (5th Cir. 1997).

[4] Id. at 338.

5

was subsequently granted,[5] the rule in <u>St. Paul Mercury Insurance Co.</u> controls and appellate jurisdiction is proper.

Appellees argue, however, that <u>St. Paul Mercury Insurance Co.</u> is inconsistent with <u>United States v. Cooper</u>[6] and <u>FirsTier Mortgage Co. v. Investors Mortgage Ins. Co.</u>[7]  <u>FirsTier</u> involved a plaintiff who had filed a notice of appeal close to a month before entry of judgment, but after a bench ruling on the same claims.  <u>FirsTier</u> held that Federal Rule of Appellate Procedure 4(a)(2) "permits a notice of appeal from the final judgment only when a district court announces a decision that would be appealable if immediately followed by the entry of judgment."[8]

In <u>Cooper</u>, the Fifth Circuit relied on <u>FirsTier</u> to hold that no appellate jurisdiction existed where a plaintiff purported to appeal from a magistrate's report and recommendation, even though the district court subsequently entered final judgment.[9]  In so

---

[5] Rule 54(b) requires an "express determination that there is no just reason for delay."  The Fifth Circuit does not require a mechanical recitation of the rule's requirements, but rather requires that the district court manifest "unmistakable intent" to make its judgment final. <u>See</u> <u>Briargrove Shopping Ctr. Joint Venture v. Pilgrim Enters., Inc.</u>, 170 F.3d 536, 539 (5th Cir. 1999).  The district court's order meets this requirement.  <u>Cf. id.</u>; <u>see</u> <u>supra</u> note 2.

[6] 135 F.3d 960 (5th Cir. 1998).

[7] 498 U.S. 269 (1991).

[8] <u>Id.</u> at 276.

[9] <u>Id.</u> at 963.

6

holding, it disapproved the "Jetco-Alcorn-Alcom" line of cases, which had held that the circuit can consider a premature appeal where judgment becomes final prior to disposition of the appeal.[10]  Though Cooper did not discuss St. Paul Mercury Insurance Co., it stated that "to the extent that our prior cases allowed appeal of non-final decisions, they are no longer good law . . . . "[11]

Cooper does not abrogate St. Paul Mercury Insurance Co.—Cooper is not an *en banc* opinion, and FirsTier (decided in 1991) is not an intervening decision (St. Paul Mercury Insurance Co. was decided in 1997).  Hence, the Cooper panel cannot have overruled St. Paul Mercury Insurance Co.[12]  Moreover, the logic of Cooper is not inconsistent with that of St. Paul Mercury Insurance Co.  St. Paul Mercury Insurance Co. may be limited to the Rule 54(b) scenario, because Rule 54(b) was created specifically to avoid piecemeal appeals and to create finality for appeal.[13]  Cooper*, on the other hand, applies to non-final orders that become final through means other than a Rule 54(b) motion; and arguably it may apply only in the more limited

_____

[10] Id.

[11] Id.

[12] See Woodfield v. Bowman, 193 F.3d 354 (5th Cir. 1999); Burge v. Parish of St. Tammany, 187 F.3d 452 (5th Cir. 1999); United States v. Short, 181 F.3d 620 (5th Cir. 1999).

[13] See FED. R. CIV. P. 54(b) advisory committee's notes.

7

situation where the order purportedly appealed from "can never be a final decision."[14]  In any event, it is unnecessary to decide today the exact scope of Cooper, since it does not conflict with St. Paul Mercury Insurance Co., by which we are bound.

We observe that finality in this case was not created by the filing or granting of the stipulated motion that purported to be a Rule 41(a) dismissal of the remaining claim against Henkel.[15] Hence, the trial court's granting of the Rule 54(b) motion was not superfluous and St. Paul Mercury Insurance Co. controls.

It is a settled rule in the Fifth Circuit that appellate jurisdiction over a non-final order cannot be created by dismissing the remaining claims without prejudice.  This rule originated in Ryan v. Occidental Petroleum Corp., in which a

---

[14] Id.; see Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 585-87 (3d Cir. 1999) (criticizing Cooper as reading FirsTier too broadly).

[15] Rule 41(a) contemplates dismissal of an "action" rather than a "claim" or "claims."  At least one court has refused to permit a Rule 41(a) dismissal of a single claim against a defendant where other claims remain against that same defendant.  See Exxon Corp. v. Maryland Cas. Co., 599 F.2d 659 (5th Cir. 1979); see also Ryan v. Occidental Petroleum Corp., 577 F.2d 298, 302 n. 2 (5th Cir. 1978) (stating in dicta that the proper way to dismiss claims against a remaining defendant is to move for amendment under Federal Rule of Civil Procedure 15).

It is unnecessary to decide whether the stipulated motion properly came under Rule 41(a), or whether the dismissal took effect upon filing, or upon the trial court's granting, of the motion.  For this reason, we will not consider Henkel's argument that the stipulation lacked effect under Rule 41(a) because it was not signed by all parties.

8

district court granted a defendant's motion and dismissed the majority of plaintiff's complaint.[16] In order to appeal, the plaintiff obtained an order dismissing without prejudice his remaining substantive claims against the would-be appellees; but the plaintiff did not file a Rule 54(b) motion to designate the earlier ruling as final.[17] The Ryan court found it lacked appellate jurisdiction because a dismissal without prejudice "cannot be regarded as terminating the litigation between the[ ] parties."[18] In the absence of Rule 54(b) certification, the trial court's rulings were held to lack finality under 28 U.S.C. § 1291.[19]

The Ryan rule is employed by three of our sister circuits.[20] But two circuits have adopted a rule directly contrary to that of Ryan.[21] In addition, three circuits have adopted a sort of middle way that requires them to evaluate cases on an individual

---

[16] 577 F.2d 298 (5th Cir. 1978).

[17] Id. at 300.

[18] Id. at 302.

[19] Id.

[20] See Cook v. Rocky Mountain Bank Note Co., 974 F.2d 147 (10th Cir. 1992); Chappelle v. Beacon Communications Corp., 84 F.3d 652 (2d Cir. 1996); State Treasurer v. Barry, 168 F.3d 8 (11th Cir. 1999).

[21] See Hicks v. NLO, Inc., 825 F.2d 118, 120 (6th Cir. 1987); Chrysler Motors Corp. v. Thomas Auto Co., 939 F.2d 538, 540 (8th Cir. 1991).

9

basis.[22]  Perhaps because of these widely varying approaches, the merits of the <u>Ryan</u> rule were discussed extensively in the Eleventh Circuit opinion of <u>State Treasurer v. Barry</u>.[23]  There, a majority of the court defended the Eleventh Circuit's maintenance of the <u>Ryan</u> rule while Judge Cox, in a special concurrence, urged *en banc* reconsideration of the rule.

As <u>Ryan</u> and other courts have stated, a party seeking to create finality through dismissal without prejudice of remaining claims must file for Rule 54(b) certification with the trial court.[24]  This permits a trial court to control its docket and make an independent determination whether an appeal is warranted under the circumstances of the case.[25]  Judge Cox's approach, which would grant parties automatic right of appeal where they dismiss all remaining claims without prejudice, is dubious for relying on the "built-in deterrents" to party manipulation.[26]

---

[22] <u>See</u> <u>Fassett v. Delta Kappa Epsilon</u>, 807 F.2d 1150, 1155 (3d Cir. 1986); <u>Horwitz v. Alloy Auto. Co.</u>, 957 F.2d 1431, 1435-36 (7th Cir. 1992); <u>Dannenberg v. Software Toolworks, Inc.</u>, 16 F.3d 1073, 1075 (9th Cir. 1994).

[23] 168 F.3d 8 (11th Cir. 1999).

[24] <u>Ryan v. Occidental Petroleum Corp.</u>, 577 F.2d 298, 302 (5th Cir. 1978); <u>Mesa v. United States</u>, 61 F.3d 20, 22 (11th Cir. 1995); <u>see also</u> <u>Broadcast Music, Inc. v. M.T.S. Enters., Inc.</u>, 811 F.2d 278, 279 n. 1 (5th Cir. 1987); <u>Oswalt v. Scripto, Inc.</u>, 616 F.2d 191, 193 (5th Cir. 1980).

[25] <u>See</u> <u>Barry</u>, 168 F.3d at 14.

[26] <u>See</u> <u>id.</u> at 20.

Further, any factors which make an appeal meritorious, and which support the argument for appeal as of right, are properly within the cognizance of the trial court in deciding a Rule 54(b) motion.

Hence, the Ryan rule requiring Rule 54(b) certification to create finality will not prevent an appeal where one is warranted. This is especially so since the abrogation of Ryan's other rule that Rule 54(b) certification is only to be granted in the "infrequent harsh case."[27] The fact that the denial of a Rule 54(b) certification is reviewable for abuse of discretion is additional insurance.

The Seventh and the Ninth Circuits have adopted an in-between rule that allows jurisdiction as long as the parties have not intended to manipulate the system.[28] However, here we agree with Judge Cox and reject the "practice of combing the record for manipulative intent" since it "waste[s] resources better spent on the merits of an appeal."[29] Ryan's bright-line rule is therefore preferable as it fosters predictability and streamlines review.[30]

---

[27] See Federal Sav. & Loan Ins. Co. v. Cribbs, 918 F.2d 557 (5th Cir. 1990) (noting abrogation by Curtiss-Wright Corp. v. General Elec. Co., 446 U.S. 1, 10 (1980)).

[28] See Dannenberg v. Software Toolworks, Inc., 16 F.3d 1073, 1075 (9th Cir. 1994); Horwitz v. Alloy Auto. Co., 957 F.2d 1431, 1435-36 (7th Cir. 1992).

[29] See Barry, 168 F.3d at 21 (Cox, J., specially concurring).

[30] Id.

In short, <u>Ryan</u> means that finality was created when the district court granted the Swopes' Rule 54(b) motion, and <u>St. Paul Mercury Insurance Co.</u> means that appellate jurisdiction is proper because, although the Swopes filed a premature notice of appeal, the orders appealed from were subsequently deemed final pursuant to Rule 54(b).

## II. Intentional Tort

Columbian is not entitled to summary judgment dismissing the Swopes' suit against it for damages based on intentional torts or batteries.  There are genuine issues as to the material facts that Columbian knew to a substantial certainty that it was continually causing Mr. Swope bodily harm by exposing him to dangerous amounts of ozone without providing him with any respiratory protection.

Many of the principal facts are undisputed.  Mr. Claude Swope was employed by Columbian from March 1987 until several days after his final inhalation of ozone on July 10, 1996. Columbian continually required Mr. Swope to breathe ozone without protective respiratory equipment throughout his nine years and some months of employment.  Columbian in this manner repeatedly caused him and other employees to breathe levels of ozone high enough to cause them respiratory discomfort, "choke ups," nausea, headaches, and chest pains.  On at least three occasions, employees other than Mr. Swope had passed out from breathing too

12

much ozone and had been taken to hospital emergency rooms or given oxygen on the plant premises. Many other times, employees had to flee the immediate vicinity in which they were working because the ozone level had become intolerable. In fact, from the deposition testimony, it appears that the only safety instruction Columbian ever gave to Mr. Swope and his fellow employees for dealing with such levels of ozone was to vacate the area of excessive concentration of ozone, get some fresh air, and return to work when feeling better. Thus, Mr. Swope was aware that Columbian continually required him to breathe high levels of ozone, but he was not aware that his inhalation of the ozone was damaging his lungs. It is not disputed for purposes of the motion for summary judgment, however, that Columbian's continual exposures of Mr. Swope to ozone caused him to sustain repetitive damage to his lungs. Mr. Swope's physician, Doctor Thomas Callendar, declared in an affidavit that he had diagnosed Mr. Swope to suffer injury from frequent exposures of ozone and other toxic substances over a period of years during the course and scope of his employment at Columbian. According to Doctor Callendar, Mr. Swope's injury occurred due to repeated exposures to ozone, not solely as a result of his last date of exposure on July 10, 1996. Therefore, the only question presented at this stage of the proceedings is whether there is a genuine issue as to whether Columbian knew to a substantial certainty that its deliberate continual exposures of Mr. Swope to such levels of

13

ozone without respiratory protection were causing him to sustain repetitive physical impairments to his bodily condition.

In order to recover from Mr. Swope's employer in tort, the plaintiffs must demonstrate that their action falls within the intentional tort exception to the exclusive remedy rule of the Louisiana Workers' Compensation Act.  The Act provides that "[e]xcept for intentional acts . . . the rights and remedies . . . granted to an employee or his dependent on account of [a work-related] injury, or compensable sickness or disease for which he is entitled to [workers' compensation benefits] shall be exclusive of all other rights, remedies, and claims for damages . . . ."[31]  The Act also provides that nothing "shall affect the liability of the employer, or any officer, director, stockholder, partner, or employee of such employer or principal to . . . the liability, civil or criminal, resulting from an intentional act."[32]

The Louisiana Supreme Court held in <u>Bazley v. Tortorich</u>, that under Section 1032 of the Workers' Compensation Act "the words 'intentional act' mean the same as 'intentional tort' in reference to civil liability."[33]  Observing that the word "intent" has generally accepted meaning in the fields of tort and

---

[31] La. Rev. Stat. Ann. § 23: 1032A(1)(a) (West 1998).

[32] <u>Id.</u> § 1032B.

[33] 397 So. 2d 475, 480 (La. 1981).

14

criminal law, the court held that "[t]he meaning of 'intent' is that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to that result."[34]

In Caudle v. Betts, the court held that when an employee seeks to recover from his employer for an intentional tort, a court must apply the legal principles of "general tort law related to the particular intentional tort alleged in order to determine whether he has proved his cause of action and damages recoverable thereunder."[35]  The court in Caudle also adopted and reaffirmed the definition and principles of law set forth in the Louisiana jurisprudence and the Restatement (Second) of Torts concerning the intentional tort of battery:

> A harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact, is a battery.  The intention need not be malicious nor need it be an intention to inflict actual damage.  It is sufficient if the actor intends to inflict either a harmful or offensive

---

[34] Id. at 481 (citing Restatement (Second) Torts § 8 (1965); LaFave & Scott, Criminal Law, § 28 (1972); W. Prosser, Law of Torts, § 8 (4th ed. 1971)).

[35] 512 So.2d 389, 391 (La. 1987).

contact without the other's consent. . . .

The original purpose of the courts in providing the action for battery undoubtedly was to keep the peace by affording a substitute for private retribution. The element of personal indignity involved always has been given considerable weight. Consequently, the defendant is liable not only for contacts that do actual physical harm, but also for those relatively trivial ones which are merely offensive and insulting.

The intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm. Rather it is an intent to bring about a result which will invade the interests of another in a way that the law forbids . . . .

Bodily harm is generally considered to be any physical impairment of the condition of a person's body, or physical pain or illness. The defendant's liability for the resulting harm extends, as in most other cases of intentional torts, to consequences which the defendant did not intend, and could not reasonably have foreseen, upon the obvious basis that it is better for unexpected losses to fall upon the intentional

16

wrongdoer than upon the innocent victim.[36]

In Louisiana, "[b]attery does not require direct bodily contact between the actor and the victim."[37] "The contact may be with an inanimate object controlled or precipitated by the actor, such as the surgeon's scalpel, a bullet or even a thrown hamburger. The victim need not be aware of the contact when it occurs."[38] Consequently, the Swopes, by alleging that Columbian frequently exposed Mr. Swope to excessive levels of ozone that it

_____

[36] Id. at 391-92 (citations omitted).

[37] Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law §2-6(a), at 28 (1996).

[38] Id. (citing Saucier v. Belgard, 445 So. 2d 191 (La. Ct. App. 3d Cir. 1984); England v. S & M Foods, Inc., 511 So. 2d 1313 (La. Ct. App. 2d Cir. 1987); Prosser, supra note 34, § 9, at 40) (footnotes omitted)). See also Fricke v. Owens-Corning Fiberglas Corp., 571 So. 2d 130 (La. 1990)(implicitly recognizing an action for battery resulting from an employer's intentional exposure of an employee to harmful gases); Thorning v. Shell Oil Co., 522 So. 2d 558, 559 (La. 1988) (reversing summary judgment against an employee who introduced evidence that an employer intentionally injured him by releasing dangerous chemicals with full knowledge of the damaging effect of such chemicals); Belgard v. Am. Freightways, Inc., 755 So. 2d 982, 984 (La. Ct. App. 3d Cir. 1999) (reversing summary judgment in favor of an employer when an employee suffered debilitating injuries after being ordered to move a trailer soaked with a toxic liquid ammonium hydroxate solution); Quick v. Myers Welding & Fabricating, 649 So. 2d 999, 1003 (La. Ct. App. 3d Cir. 1994) (reversing summary judgment in favor of an employer whose employee was burned after pure oxygen was deliberately introduced into a tank in which he was welding); Trahan v. Trans-Louisiana Gas Co. Inc., 618 So. 2d 30, 31 (La. Ct. App. 3d Cir. 1993) (reversing an exception of no cause of action because an employee's "neuro-toxic" injuries were substantially certain to follow from his exposure to excessive levels of mercaptan); Major v. Fireman's Fund Ins. Co., 506 So. 2d 583, 584 (La. Ct. App. 4th Cir. 1987) (reversing summary judgment in favor of an employer who ordered an employee to work on the "hot rollers" after being informed that the plaintiff could not work around chemicals)

17

knew to a substantial certainty would be harmful to his health, stated a valid cause of action in battery against Columbian.

Rule 56(c) of the Federal Rules of Civil Procedure allows the court to enter summary judgment in favor of the moving party only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[39]  The moving party has the burden of demonstrating clearly that there is no genuine issue of fact.[40]  Moreover, the evidence presented at the hearing on the motion must be considered in the light most favorable to the opposing party, and he must be given the benefit of all inferences that might reasonably be drawn in his favor.[41]

When the nonmovant would bear the burden of proof at trial, however, the moving party can make a proper summary judgment motion in reliance on the pleadings and the allegation that the nonmovant has failed to establish an element essential to that

---

[39] Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

[40] Celotex, 477 U.S. at 323.

[41] W.H. Scott Constr. Co., Inc. v. City of Jackson, Mississippi, 199 F.3d 206, 211 (5th Cir. 1999) (citing King v. Chide, 974 F.2d 653, 655-56 (5th Cir. 1992)).

18

party's case.[42]  Rule 56(e) then would require the opposing party to go beyond the pleadings and to designate specific facts showing there was a genuine issue for trial.[43]  However, "[t]he burden on the nonmoving party is not a heavy one; the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial."[44]

In the present case, the Swopes satisfied this requirement by introducing the countervailing evidence discussed below. Columbian had been provided Material Safety Data Sheets (MSDS) regarding ozone for at least ten, and probably twenty, years prior to Mr. Swope's disability.  The MSDSs dated April 3, 1986, and April 12, 1994, state, *inter alia*,: "DANGER! OZONE IS A HIGHLY TOXIC, IRRITANT GAS!  MAY BE FATAL IF INHALED!  MAY CAUSE DAMAGE TO THE LUNGS, RESPIRATORY SYSTEM, AND EYES!  DO NOT GET IN EYES, ON SKIN, OR ON CLOTHING.  DO NOT BREATHE GAS OR VAPOR.  USE ONLY WITH ADEQUATE VENTILATION.  WASH THOROUGHLY AFTER HANDLING.

---

[42] Celotex, 477 U.S. at 323.

[43] Id. at 327.

[44] 10A Charles Alan Wright et al., Federal Practice and Procedure § 2727, at 490 (3d ed. 1998) (citing First Nat. Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)("It is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.")).

KEEP AWAY FROM COMBUSTIBLE MATERIALS." The MSDS also contained the following warnings concerning long term exposure to various concentrations of ozone:

> Effects of prolonged, low level (0.3 ppm) exposure are not well defined; however, scarring and thickening of small air passages may result in chronic lung disease. In addition, people with existing lung disease may show earlier and more severe symptoms when exposed to ozone. An increased susceptibility to lung disease and infection may also occur. . . . Symptoms usually begin with a sensation of tightness in the chest on deep inspiration and discomfort under the breastbone . . . . Uncontrollable coughing spasms develop with prolonged exposure.

The Swopes introduced deposition testimony demonstrating Columbian's knowledge that it was requiring Mr. Swope and other employees to inhale dangerous levels of ozone without protective equipment. Mr. Bobby Jordan, Columbian's general plant manager, and Mr. Richard Bianchi, Columbian's maintenance supervisor, former project engineer, and 30(b)(6) witness, testified that Columbian knew during Mr. Swope's employment that inhalation of ozone could be fatal to workers and damaging to their lungs.

The Swopes presented evidence from which a reasonable jury could find that Columbian was forewarned that it was exposing Mr. Swope and other employees without protection to lung-damaging

20

concentrations of ozone. On July 17, 1987, Mr. Thomas McQuiston, an industrial hygienist on behalf of the International Chemical Workers Union, Local 638, warned Columbian of the danger of ozone damage to workers in the Columbian plant. Mr. McQuiston's report, based on his August 7, 1986 tour of the plant, described to Columbian the long-term effects of excessive ozone exposure and specifically warned Columbian that workers' complaints of ozone exposure indicated "that the <u>enclosed systems are not adequately designed and/or maintained to provide adequate protection against exposure</u>" and that a "<u>preventative maintenance program should be implemented [to] assure[] potential leaks in the system are prevented.</u>" (emphasis added). His report to Columbian stated that excessive ozone exposure could result "scarring and thickening of the small air passages" and could result in "chronic lung disease" and noted that "[w]orkers have complained of symptoms related to ozone exposure[]." Mr. McQuiston's report also warned Columbian that "[c]hronic exposure tends to decrease a worker's ability to sense the presence of ozone;" although "[s]ome workers can detect the [ozone] odor down to 0.05 ppm . . . , chronically exposed workers have not been able to sense the presence of ozone at 0.3 ppm (three times the OSHA limit)." A year before Mr. Swope's last ozone exposure, Columbian was again warned that it was exposing its employees to harmful levels of ozone. On June 14, 1995, Mr. Laurence Durio of Durio Consulting Services, an industrial hygiene consulting

21

group, advised Columbian that the Short Term Exposure Limit for ozone was 0.2 parts per million. "With that as a basis for comparison," the report concluded, "excessive ozone concentrations were found around the ozone generators and the number two ozone treater [in Columbian's plant], which would likely translate into excessive employee exposures." (emphasis added). Moreover, Mr. Bianchi admitted that despite several surveys and recommendations made by the workers' union to install air-monitoring equipment, Columbian did not purchase or install any ozone monitors until after Mr. Swope's final inhalation on July 10, 1996.[45] He added that the monitors were removed soon afterwards because they constantly sounded alarms indicating excessive concentrations of ozone in the plant. In this regard, Mr. Bianchi stated, "[Y]ou can't walk--you can't walk outside the building without it sounding whether you're in here in this office or anywhere else." The Swopes also introduced the December 9, 1998 report of Mr. Joseph Wood, an Industrial Hygienist and Safety Professional certified by both the American Board of Industrial Hygiene and the Board of Certified Safety Professionals, who concluded that "Columbian purposely disregard[ed] the health of their employees by allowing them to be exposed to potentially harmful concentrations of ozone."

[45] Although Mr. Bianchi's deposition does reveal that Dasivi monitors were installed in the mid-seventies, they were removed long before Mr. Swope began his employment with Columbian and are not relevant here.

(emphasis added). Mr. Wood evaluated Mr. Swope's accident in light of existing OSHA compliance issues and based his conclusions on the absence of ongoing ozone monitoring programs, the absence of historical data showing that monitoring was not necessary, the findings of multiple industrial hygienists that ozone levels exceeded permitted limits during normal operations, the knowledge that maintenance activities involve higher levels of ozone containment, and the absence of point source ozone monitoring at the generators prior to opening.

Furthermore, the Swopes introduced other evidence from which it reasonably may be inferred that Columbian knew that Swope and other employees were being bodily harmed by their unprotected exposures to ozone. Mr. Bianchi testified that Columbian knew that union members at its plant had complained about exposures to ozone. Ozone leaks, according to Mr. Bianchi, "could [occur] once a month, sometimes once a week." In fact, Mr. Bianchi, himself, admitted to having been exposed to ozone, and, over the course of his thirty years of employment, Mr. Bianchi said the smell of ozone has "always been there." Mr. Swope's fellow mechanic and relief foreman Mr. Russell Salkowitz testified during his deposition that "everyone" complained about ozone exposure. Mr. Salkowitz claimed that "at least 90 percent of the plant had bad whiffs of ozone" causing headaches, upset stomach, and chest pains. Mr. Salkowitz further testified that he had been exposed to ozone in the plant a couple of hundred times.

23

Plant foreman Mr. David Self also recounted his own exposures to ozone, causing him coughing spasms, and estimated that operators at the plant had a "choke up" from ozone exposures "once a day or once a week." Mr. Self further testified that sometimes ozone exposure became so pervasive and intense that the whole plant had to be shut down. Depositions taken from Columbian employees Mr. Leonce Boudreaux and Mr. Curtis Shoop corroborated the testimony of Mr. Salkowitz, Mr. Swope, and Mr. Self, regarding the frequency of worker exposure to ozone. Mr. Boudreaux testified, "[S]ometimes it was -- ozone was strong enough where you couldn't, you know, really go in there [the plant] and work on the generators." When asked how many times Mr. Shoop had inhaled ozone in his work at Columbian, he replied, "It cannot be numbered. . . . A bunch."

Mr. Bianchi testified that he knew of at least one case in which an operator got sick and was taken to the emergency room because of inhaling or coming into contact with ozone. Mr. Boudreaux testified that he now suffers from headaches that he did not have before he worked at Columbian. Mr. Boudreaux also testified that he missed work because of ozone exposure but that his absences were not recorded. Mr. Boudreaux recounts that one night when he arrived at work the ozone smell was so strong that it pervaded the entire parking lot. When Mr. Boudreaux began work that night, the union president "called S-Unit and told them they needed to clear up because the ozone was too strong." That

24

night when Mr. Boudreaux went home, he suffered a migraine headache lasting through the entire next day, vomited, and did not return to work the next night. Mr. Curtis Shoop, another Columbian employee, testified that he has had coughing and gasping episodes from ozone and that he witnessed a co-worker, Mr. Tommy Comeaux, collapse on the job as a result of ozone exposure. Mr. Van Adams testified that as a result of ozone exposure he experienced nausea and a tightness in his chest. Mr. Swope testified that he knew of two other Columbian employees, Mr. Mike Chauvin and Mr. Harry Johnson, who had been taken to the hospital because of ozone exposure.

Mr. Swope testified that Columbian never informed him of the characteristics of ozone, its chemical properties, or the danger of lung damage from excessive ozone exposure. He stated that Columbian gave him no special handling instructions regarding ozone, even though he was constantly exposed to the gas emitted by the generators during his work. Mr. Swope described the employees' exposures and Columbian's attitude and response to their painful or distressing inhalation of ozone as follows:

> We were constantly exposed to -- from working on the generators on a -- you know, quite often basis. We worked -- you know, it seems like they could have schooled us a little, or maybe went over some material data sheets on this chemical to let us know the severity of it and maybe supplied us with, you know, protective, personal protection equipment, properly handled the situation. And it was -- you were exposed to ozone on a routine basis, and they took it like it wasn't no big deal. If you breathe some, they would suggest, you know, you go outside and get some fresh

25

air and -- you know, if you're exposed to it, get out
and breathe some fresh air and then go back to work. .
. .  Several people complained about -- you know,
complained about it. . . . [T]wo other people were
exposed to it and had to be sent to the emergency room.
Not on a particular piece of equipment I was working
on, but in operations they were exposed to the chemical
and had to be treated for it in emergency.  One of them
spent the night in emergency -- in the hospital, and
I'm not sure of the treatment of the other fellow.  It
seemed like that would have sent some warning flags off
to further educate your employees about the severity of
the chemical that you had the possibility of being
exposed to.

Co-workers Mr. Shoop, Mr. Self, and Mr. Van Adams corroborated
Mr. Swope's testimony and stated that Columbian never warned its
employees that chronic ozone exposure could be fatal and cause
permanent lung damage.

Columbian's officers, Mr. Bianchi and Mr. Jordan, admitted
that the company had refused to monitor ozone levels during Mr.
Swope's employment, despite OSHA regulations requiring it to
report ambient ozone levels of over .06 grams per cubic meter.
And, because of Columbian's lack of monitoring and testing of air
quality, Mr. Bianchi conceded that he could not say whether
Columbian was in compliance with OSHA.  According to Mr. Jordan,
Columbian had fewer than five self-contained breathing
apparatuses to meet the needs of one hundred twenty shift
workers, and these remained stored in a shed three hundred yards
away from the ozone generator buildings.

Columbian supported its motion for summary judgment with the
affidavit of its general manager, Mr. Bobby Jordan, who stated in

26

conclusory fashion that Columbian "did not subjectively intend Mr. Swope's alleged injuries to result from the work tasks assigned to" him and that Columbian "was not substantially certain that Mr. Swope's injuries would follow from performing the assigned work tasks. . . ." Although Mr. Jordan did attest that he had personal knowledge of the matters in his affidavit, he did not state what, if any, underlying facts within his knowledge enabled him to reach those conclusions. Mr. Jordan's only statement clearly based on his direct personal knowledge was that he "did not observe harmful or toxic exposure to plant employees on a routine basis, nor [was he] aware that other Columbian employees observed such exposures." Yet in his final statement Mr. Jordan admitted that "in any situation in which, through upset, there have been any kind of exposures, Columbian Chemicals always took action to make them as short as possible by terminating the cause of the incident and taking appropriate remedial action." Moreover, in his deposition Mr. Jordan did not profess to be very knowledgeable about ozone at the plant. He instead deferred to Mr. Bianchi to answer questions concerning ozone hazards and safety. Mr. Bianchi, on the other hand, who was designated as Columbian's 30(b)(6) witness and who was best qualified to answer questions regarding the operations and maintenance of the ozone generators by virtue of his 30 years of experience with the company, did not at any time during his two depositions deny that he and Columbian knew to a substantial

27

certainty that Columbian had continually exposed Mr. Swope and other employees to bodily harmful concentrations of ozone during the period of Mr. Swope's employment.

Consequently, considering all of the evidence of record it is clear that a reasonable jury could find that Columbian knew to a substantial certainty that it was continually exposing Mr. Swope to high levels of ozone without affording him the protection of any respiratory safeguard and that his direct inhalations of such large quantities of ozone would do gradual, but definite and repeated, bodily harm to him. At the very least, there is a genuine issue as to whether Columbian knew to a substantial certainty that its activities would cause a physical impairment of the condition of Mr. Swope's body or cause him pain or illness. Under Louisiana law, in order to prove a battery, it is not necessary for the plaintiff to show that a tortfeasor desired to do any harm or even that the defendant knew to a substantial certainty the full extent of the bodily harm that would result.[46] Because the pleadings, affidavits, and depositions present conflicting evidence from which a jury could reasonably reach different conclusions as to whether Columbian knew that some physical impairment to the condition of Mr. Swope's body was substantially certain to follow from his

---

[46] Fricke v. Owens-Corning Fiberglas Corp., 571 So.2d 130, 132 (La. 1990); Caudle v. Betts, 512 So.2d 389, 391-92 (La. 1987); Restatement (Second) of Torts § 16 (1965).

repeated exposures to and unprotected inhalations of ozone, we conclude that the district court fell into error in granting Columbian's motion for summary judgment.

### III. PEREMPTION UNDER LA. REV. STAT. § 9:2772

The district court granted Henkel's motion for summary judgment against the Swopes based on a statute of peremption or repose, Louisiana Revised Statute § 9:2772, which provides, in pertinent part, that "[n]o action . . . to recover damages shall be brought . . . against any person performing . . . services preparatory to construction, or against any person performing or furnishing the design, planning, supervision, inspection, or observation of construction or the construction of an improvement to immovable property" more than ten years after an acceptance or occupation of the work or the improvement by the owner.[47]  The Swopes do not dispute that ten years elapsed between Columbian's acceptance or occupation of the installation of the generators and the discovery of their claims against Henkel on or about July 10, 1996.  To be entitled to the benefits of the statute, however, Henkel must prove that the equipment manufactured by its predecessor, Emery, became part of an improvement to immovable property,[48] and that Emery performed the construction of that

---

[47] La. Rev. Stat. Ann. § 9:2772 (West 1991).

[48] Moll v. Brown & Root, Inc., 218 F.3d 472, 475 (5th Cir. 2000) (per curiam).

29

improvement,[49] as the statute is "inapplicable to contracts of sale."[50] Upon review of the summary judgment record, we conclude that Henkel has failed to show that there is no genuine issue as to any material issue and that it is entitled to judgment as a matter of law.[51]

The Louisiana Civil Code defines an obligation as "a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee."[52] That performance "may consist of giving, doing, or not doing something."[53] "The obligation to give is one whereby the obligor binds himself to transfer to the obligee the ownership of a thing

---

[49] Riley Stoker Corp. v. Fid. & Guar. Ins. Underwriters, Inc., 26 F.3d 581, 591 (5th Cir. 1994); Bunge Corp. v. GATX Corp., 557 So.2d 1376, 1381 (La. 1990); Smith, III v. Arcadian Corp., 657 So.2d 464, 469 (La. Ct. App. 3d Cir. 1995); Jones v. Crane, 653 So.2d 822, 827 (La. Ct. App. 2d Cir. 1995); DeWoody v. Citgo Petroleum Corp., 604 So.2d 92, 99 (La. Ct. App. 3d Cir. 1992); Tenneco Oil Co. v. Chicago Bridge & Iron Co., 495 So.2d 1317, 1322 (La. Ct. App. 4th Cir. 1986); Summerfield v. Harnischfeger Indus., Inc., No. Civ. A. 97-3683, 1998 WL 726080, at * 2 (E.D. La. Oct. 13, 1998).

[50] KLSA-TV, Inc. v. Radio Corp. of Am., 693 F.2d 544, 545 (5th Cir. 1982) (per curiam).

[51] Louisiana Revised Statute § 9:2772 also provides for the peremption or repose of actions against persons performing certain types of land surveying services. La. Rev. Stat. Ann. § 9:2772 (West 1991). However, we are not concerned with any of these types of actions in this appeal.

[52] La. Civ. Code Ann. art. 1756 (West 1996).

[53] Id.

or to grant him some other real right in a thing."[54]   "The obligation to do is one whereby the obligor binds himself to carry out or execute an act, or a series of acts, other than the transferring a real right, such as making or manufacturing something or rendering a service."[55]   The distinction between obligations to give, e.g., sales, and obligations to do, e.g., building constructions, is material to the judicial determination of questions involving transfer of ownership, risk of loss, prescription, and remedies.   Consequently, Louisiana courts (and federal courts applying Louisiana precedents) are frequently required to classify contracts as one or the other when one obligor is bound under one contract both to transfer things and provide services or labor to the obligee.[56]

---

[54] Saúl Litvinoff, Obligations, § 1.4, at 7 (5 Louisiana Civil Law Treatise 2d ed. 2001) ("Litvinoff II").

[55] Id. § 1.4, at 8.

[56] See, e.g., Harris v. Black Clawson Co., 961 F.2d 547, 553 (5th Cir. 1992)(Obligor Black Clawson designed and participated in the construction and installation of a hydrapulper, a reinforced concrete tub measuring twelve by eighteen feet, inside the obligee's forest products plant.   The court concluded that the obligor's obligation was to construct the hydrapulper, not merely to sell it to the obligee.   "[I]t is simply not possible that such a large structure could be constructed elsewhere and shipped to the site for installation. . . . [I]t cannot be said that the installation provision of the contract for the design and installation of the tub was merely incidental to the tub's sale."); KSLA-TV, Inc. v. Radio Corp., 501 F.Supp. 891, 896 (W.D. La. 1980), aff'd and adopted by, 693 F.2d 544 (5th Cir. 1982)(KSLA-TV contracted with RCA to design, fabricate, and install a television antenna tower.   Using the fundamental obligation test supplemented

When it is possible to isolate one type of obligation from another owed by the same obligor, each obligation remains subject to the rules applicable to its own kind.[57]  But when a single obligor's plural obligations are intimately connected, one of the obligations must be recognized as fundamental, and the whole contract treated as giving rise to obligations of that kind.[58]

Analogously, when two obligors are each bound to perform a different obligation for the same obligee, if the performance of each may be separately identified, each obligation remains subject to the rules applicable to its own kind.  For example, in Conmaco v. Southern Ocean Corp., Conmaco, an independent distributor, sold a craning block to Ocean Salvage, which had been constructed by McKissick.[59]  Although the block was built

---

by a balancing of economic factors the court determined that the contract involved primarily an obligation to do, "primarily the furnishing of labor and the contractor's skill in the performance of the job."); Rasmussen v. Cashio Concrete Corp., 484 So.2d 777, 778 (La. Ct. App. 1st Cir. 1986)(Obligor furnished and installed a 5.58 ton home sewer treatment plant.  The court concluded that the primary object of the agreement was the sale of a workable sewer treatment plant; the installing of the unit was secondary, ancillary, to the sale.); Papa v. Louisiana Awning Co., 131 So.2d 114, 117 (La. Ct. App. 2d Cir. 1961)(The obligor contracted to assume two obligations: to deliver or transfer to the obligee a patio cover and to install and attach it to the obligee's house. The court found that the obligation to do was fundamental.).

[57] 2 Saúl Litvinoff, Obligations, § 157, at 287-88 (7 Louisiana Civil Law Treatise 1975) ("Litvinoff I").

[58] Conmaco, Inc. v. S. Ocean Corp., 581 So.2d 365, 368 (La. Ct. App. 4th Cir. 1991)(citing Litvinoff I, § 158 at 291).

[59] Id. at 366.

32

according to specifications furnished by Ocean Salvage, and there had been consultations between all three parties in drawing up the specifications, the court held that Conmaco's obligation was one to give, i.e., to sell or transfer ownership of the block to Ocean Salvage, and not an obligation to do: "The mere fact than an obligor may be involved in the installation and delivery of the equipment will not change the characterization of the obligation from that of a sales contract and therefore the rules governing a sale will control."[60]

In DeWoody v. Citgo Petroleum Corp., Nelson Electric Company manufactured and sold a 4,160 volt motor starter to Industrial Supply Company, which in turn sold and delivered the product to Citgo.[61] The motor starter was installed in Citgo's refinery, evidently by a person other than Nelson Electric Company.[62] In determining that a claim against Nelson Electric was not extinguished by peremption or repose, the court necessarily concluded that the obligation performed by Nelson Electric was that of a sale of its product, not an obligation to build or install the product in Citgo's refinery.[63] "To be entitled to

---

[60] Id. at 370.

[61] 604 So.2d 92, 98 (La. Ct. App. 3d Cir. 1992).

[62] Id. at 98-99.

[63] Id. at 99.

the benefits of La. R.S. 9:2772, it was not enough that it be shown that the equipment manufactured by Nelson Electric ultimately became an improvement to immovable property. . . . [I]t must be shown that Nelson Electric was a contractor."[64]

In Tidewater, Inc. v. Baldwin-Lima Hamilton Corp., Boyce Machinery Corporation sold a crane to Tidewater which Boyce had acquired from Baldwin-Lima, the crane's manufacturer.[65] An independent shipbuilder installed the crane on a vessel it constructed for Tidewater.[66] Boyce inspected the crane after its installation for proper working order and to make certain Tidewater's employees were instructed in the crane's proper operation and care.[67] The court concluded that the contract between Boyce and Tidewater was a contract of sale.[68] "Although the manufacturer and [Boyce] may have consulted with the plaintiff and jointly participated in the drawing up of specifications for the crane . . . [,] these actions do not change [the] sales contract to an obligation to do or not to do. The mere fact that an obligor may be involved in the installation

---

[64] Id.

[65] 410 So.2d 355, 355-56 (La. Ct. App. 4th Cir. 1982).

[66] Id. at 356.

[67] Id.

[68] Id. at 357.

34

and delivery of the equipment will not change the . . . obligation from that of a sales contract. . . ."[69]

In Jones v. Crane Co., Crane manufactured a central heating unit which ultimately was installed in a house during its construction by an independent building contractor.[70] Crane did not install the unit, the ventilation system, the gas plumbing, the interior wires, or the duct system to which the unit was connected.[71] In addition, "[n]othing in the record indicate[d] that the [central heating] unit was designed or manufactured specifically for th[at] particular house."[72] Consequently, the court held that Louisiana Revised Statute § 9:2772 was not applicable because Crane had not proved that it had entered or performed a contract to build or install the central heating unit in the house.[73]

Applying the foregoing principles of law to the present case, we conclude that Henkel is not entitled to a summary judgment as a matter of law declaring that its obligation to the Swopes as successor to the manufacturer of the generators in

---

[69] Id.

[70] 653 So.2d 822, 827 (La. Ct. App. 2d Cir. 1995).

[71] Id.

[72] Id.

[73] Id.

question under the LPLA has been extinguished by peremption or repose under Louisiana Revised Statute § 9:2772.  It is undisputed that Columbian purchased the generators in question from Henkel's predecessor, Emery, and contracted with an independent building contractor to have them installed on Columbian's property; that the independent construction contractor installed the generators either autonomously or under the surveillance of Columbian; and that Emery's post-sale services were limited to the secondary, ancillary, chores of inserting glass dielectric tubes and checking to see that the generators were in proper working order.  Mr. Richard Bianchi of Columbian testified that "construction was done through an independent contractor retained by Columbian" and that Henkel had "absolutely nothing to do with the installation of the unit after it was delivered to Columbian." Thus, the summary judgment evidence indicates that Emery did not supervise or participate in the installation.  Emery advised only on how to "operate the equipment," not how to install it.  In fact, the record indicates that Emery may not have even arrived at the scene until the generators were "almost ready to go."  The summary judgment evidence is also clear that the work of connecting external piping and tubing to the generators as sold by Emery was all supplied by Columbian.

Moreover, from the evidence in the record, it does not

appear that Emery custom-made or designed the generators specifically for Columbian. The record indicates that Columbian assigned Mr. Bianchi the responsibility for the purchase and installation of the new ozone generators. Mr. Bianchi went to Emery's factory in Cincinnati, "looked at [the Emery] equipment," and placed an order: "We purchased them and they worked." Evidently, Emery manufactured several different models of generators in standardized forms, each with different characteristics and capabilities. The record indicates that Columbian simply related the production capacity it needed within its particular plant environment, and Emery sold Columbian the particular model of generator that would meet these needs. Mr. Bianchi testified that the information provided to Emery was limited to "how much ozone they would produce per hour or pounds per day, the concentration, the voltage that they operated at or the incoming voltage, . . . [and] the type of air [we] had." These figures were simply the raw data used by Emery to decide which model of its generator to recommend and sell to Columbian. Columbian's "needs" data no more amounted to the specifications for a custom-designed or custom-made generator than would a request for a standard truck model having a certain load or power capacity. Furthermore, nothing in the record specifies any modifications in model structure, characteristics, or capabilities to be performed by Emery in connection with the sale

37

and delivery of the generators.

Finally, even if Emery owed two obligations, one to give, i.e., to sell, and one to do, i.e., perform incidental services, the performance of the obligations would not fall within the ambit of the statute of peremption or repose because the inspection and insertion of the glass tubes into the generators was de minimis in comparison with the performance of the obligation to give or sell the generators. The parties' failure to assign any value or cost to Emery's post-sale services plainly indicates that they were insignificant in economic value in relation to the performance of the obligation to give or sell.

In sum, Emery, the vendor of the generators, performed an obligation to give, i.e., sale of equipment, to the obligee, Columbian, and the independent building contractor performed the obligation to do, i.e., installation and assembly of the generators for the obligee. Consequently, Henkel failed to demonstrate the absence of a genuine issue of material fact that, as a matter of law, it performed an obligation to do, i.e., install or construct, rather than an obligation to give, i.e., to transfer ownership of the ozone generators to Columbian.

## IV. INADEQUATE WARNING

At the outset, it is important to note that in this section we deal with the issue of whether Columbian knew or reasonably should have been expected to know of the alleged dangerous

characteristic of the generator that allegedly caused bodily harm to Mr. Swope on July 10, 1996. This is different from the issue we dealt with in Section II, viz., whether Columbian knew to a substantial certainty that its operations in general, over a period of time, were exposing Mr. Swope to harmful levels of ozone caused not only by purgation defects in generators, but also by other exposures, including during Columbian's manufacture of carbon black using ozone after it had been produced by the generators.

In support of its motion for summary judgment seeking dismissal of the Swopes' products liability claim, Henkel argues that "it is sufficient that the manufacturer prove that the plaintiff (or his employer) **should** have known of the danger. . . [and that] there is no duty under Louisiana law to warn an employee of a sophisticated user or purchaser of the dangers of a product."[74] Henkel relies exclusively upon a sophisticated user or purchaser defense to excuse Emery from its duty as manufacturer to use reasonable care to provide users and handlers of the product with an adequate warning[75] about the product's

---

[74] Henkel Br. at 16-17 (emphasis in original).

[75] LPLA § 2800.53(9) provides: "'Adequate warning' means a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a

39

dangerous characteristics at the time it left the manufacturer's control.[76]  The Louisiana Products Liability Act "establishes the exclusive theories of liability for manufacturers for damage caused by their products."[77]  The only provision of the LPLA that affords a basis for arguing or guessing that manufacturers' liability is limited by a sophisticated user or purchaser defense is section 2800.57(B)(2), which states that a manufacturer is not required to provide an adequate warning about his product if the "user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product

_____

manner as to avoid the damage for which the claim is made."  La. Rev. Stat. Ann. § 9:2800.53(9) (West 1997); see also Thomas C. Galligan, Jr., The Louisiana Products Liability Act: Making Sense Of It All, 49 La. L. Rev. 629, 675-76 (1989) ("A striking element of the definition is that it equates warning and instruction. . . . The 'warning' under the Act must both alert and instruct.  The conjunctive nature of the definition demands [that] the warning must both lead the ordinary user or handler to contemplate the danger in using the product (the warning component) and to either use it safely (the instruction component) or to decline to use it.").

[76] La. Rev. Stat. Ann. § 9:2800.57(A) (West 1997) (defining "unreasonably dangerous because of an inadequate warning").  It deserves emphasis that Henkel did not move for summary judgment on other grounds, such as, e.g., that the 30-minute purgation instruction provided an adequate warning of that hazard, or that Emery did not know or reasonably could not have known of the dangerous characteristic of the generator.  Consequently, we presume these factual issues to have been resolved in favor of the non-movant, the Swopes, for purposes of our de novo summary judgment review.

[77] La. Rev. Stat. Ann. § 9:2800.52 (West 1997).

that may cause damage and the danger of such characteristic."[78] Consequently, as Henkel concedes, under any sophisticated intermediary defense the threshold burden is on the manufacturer to prove that the purchaser-intermediary knew or reasonably should have been expected to know of the dangerous characteristic of the product that caused the damage.[79]  In a jury trial, if reasonable minds could differ on that question, the court must submit the issue to the jury with a proper instruction.[80] Consequently, in seeking summary judgment on this issue, Henkel has the threshold burden of demonstrating that there is no genuine issue as to the fact that Columbian already knew or reasonably should have known of the dangerous characteristic of

---

[78] Id. § 9:2800.57(B)(2); see also Davis v. Avondale Industries, Inc., 975 F.2d 169, 172-73 (5th Cir. 1992)(citing LPLA §9: 2800.57(B)(2) as statutory authority for an Erie guess "that Louisiana courts would likely hold that in a setting such as this the product manufacturer owes no duty to the employee of a purchaser if the manufacturer provides an adequate warning of any inherent dangers to the purchaser or if the purchaser has knowledge of those dangers and the duty to warn its employees thereof.") (emphasis omitted).  Subsequent to the enactment of the LPLA and this court's decision in Davis one Louisiana intermediate appellate court has expressed uncertainty as to whether the LPLA perpetuates a sophisticated purchaser or user defense. Black v. Gorman-Rupp, 655 So.2d 717, 722 (La. Ct. App. 4th Cir. 1995) ("The LPLA does not explicitly address this 'sophisticated user' concept, but instead speaks of 'the ordinary user or handler of the product.'  At the present time, we need not decide . . . the issue of whether the 'sophisticated user' defense is carried forward under the LPLA . . . .") (citations omitted).

[79] Henkel Br. at 16-17; see also Davis, 975 F.2d at 174.

[80] See Davis, 975 F.2d at 172-75.

41

the generator, viz., its propensity to retain and recycle ozone so that, contrary to Emery's instructions and representations, a 30-minute purgation period was not a sufficient precaution to ensure the safety of a worker opening the generator door to replace a glass dielectric tube. We conclude that Henkel did not carry this burden because based on the record presented for our review a reasonable jury easily could find that Columbian did not already know and reasonably should not have been expected to know of that hazardous characteristic of the generator and the nature and magnitude of the danger it entailed.

In support of its motion, Henkel relied upon evidence in the record that Columbian manufactured carbon black with a process that involves the use of ozone for over 55 years and held a patent on its process; and that since 1982 or 1983 Columbian has used the Emery generators in question to produce ozone for subsequent use in its carbon black manufacturing process. The record reflects, however, that Columbian's process of making carbon black with ozone is distinct from the generation of the ozone with the Emery and other makes of generators. Discovery was limited to issues concerning the Emery ozone generators; Columbian did not permit questions concerning the use of ozone after it left the generators and was used in the actual carbon black manufacturing process in which Columbian had a proprietary interest. Nevertheless, Henkel contends, in effect, that a

42

reasonable jury would be unable to find that Columbian did not already know or should not have been expected to know of the dangerous characteristic of the Emery generator and the inadequacy and inaccuracy of Emery's safety instructions and representations. We disagree – especially in light of the countervailing evidence presented by the plaintiffs.

In opposition to Henkel's motion for summary judgment the Swopes presented, *inter alia*, the report of their expert witness, Mr. Stephen A. Killingsworth, a registered professional mechanical engineer, and the depositions of Mr. Richard Bianchi, Columbian's maintenance supervisor and former project engineer, Mr. Swope, and other employees of Columbian. Mr. Killingsworth reported on the characteristics of the ozone generator that caused damage to Mr. Swope, in pertinent part, as follows:

- **Observations/Opinions** - Emery did not provide a method to monitor and/or determine the presence of ozone within the ozone generator during system shutdown and/or maintenance of the generator, specifically when the generator heads are removed. Emery acknowledged and incorporated safety relative to the protection of the equipment such as high and low air pressure, low cooling water flow and high gas and water temperature. However, Emery does not acknowledge and incorporate safety

43

into the design of the generator relative to the protection of the individual or work[er] maintaining the equipment, specifically installing a monitor and/or detection system to determine the presence of ozone prior to or during maintenance of the generators. The design of Emery ozone generators should have included an ozone monitoring and/or detection system.

- **Observation/Opinions** - Emery's maintenance and safety procedures do not include considerations for leakage and/or improper system purging. Emery's procedure requires a post-purge of the entire system for a minimum of 30 minutes to drive the ozone out of the ozone generator and all downstream piping. However, the process is flawed. The ozone generator and piping does not include a monitor and/or detection system to determine if the system is truly purged of all ozone. Ozone may remain within the system or re-enter the system through valve leakage, improper purging including insufficient purge time or insufficient flow of the purging media or simply human error. Emery should have provided a maintenance and safety procedure that included

44

considerations for leakage, improper purging and human error.

Thus, Mr. Killingsworth reported that Emery's purging instructions were both inadequate and untrue because they inaccurately represented that the prescribed 30-minute purge was sufficient to remove all ozone from the generator and make it safe to be opened for maintenance. Mr. Bianchi testified that under the guidance and instruction of Emery employees, Mr. Quisno and Mr. Merit, he helped write operation and repair procedures for the Emery generators based on Emery's operation manual; and, that among the operations and repair procedures necessary to insure a safe work environment is a prescribed 30-minute purge of the generators. Mr. Killingsworth's report stated that he had taken into account an itemized list of materials, including "[a] copy of the Emerzone Ozone Treatment System's Operation and Maintenance Manual for the Columbian Chemicals Company North Bend Ozone Facility[.]" A reasonable jury could infer from Mr. Killingsworth's report and Mr. Bianchi's deposition that Emery conveyed to Columbian the inadequate and inaccurate purging instructions described by Mr. Killingsworth via the Emery operation and maintenance manual and other written and oral communications. The deposition of Mr. Bianchi combined with that of Mr. Swope tend to corroborate the inadequacy and inaccuracy of the purging instructions. Although Mr. Bianchi could not say for

45

certain how long the generator that delivered the last blast of ozone to Mr. Swope on July 10, 1996, had been shut down, he did testify that at the time a "thirty-minute purge" was the standard time for pre-maintenance shutdown. Mr. Swope testified that after he and a co-worker opened the generator door and replaced the dielectric tube, they shut the door temporarily while the co-worker fetched some silicone to apply to a gasket. When the door was reopened and after Mr. Swope began to apply the silicone, he was struck in the face by a blast of ozone mist. He fell to his knees, unable to breathe, and crawled away from the open generator door vomiting. Afterwards he suffered from respiratory difficulties, was given oxygen, and spent the remainder of the work day in the company's air conditioned lunch room. Mr. Leonce Boudreaux, the co-worker who witnessed the accident, corroborated Mr. Swope's testimony.

Henkel does not address the evidence of record in any detail in an effort to show that there is no genuine issue as to whether Columbian already knew or reasonably should have been expected to know of the Emery generator's dangerous characteristic of retaining ozone after the 30-minute purgation period in contradiction to Emery's safety instructions and representations of facts. Henkel presents two arguments based on the general facts that Columbian had extensive knowledge and experience in making carbon black with a process involving ozone; and that

46

Columbian had used the Emery ozone generators to produce ozone for this process.

The first argument, in effect, merely suggests that because of Columbian's experience with the Emery generators, a reasonable inference could be drawn that it already knew or should have known of their dangerous characteristics. We need not decide whether this is a reasonable inference which could be drawn from the record evidence. Assuming arguendo that it is, a jury could with equal, if not more, reasonableness find that Columbian reasonably relied on the safety instructions and representations of Emery and did not discover their inaccuracy and the dangerous characteristic of the generator to retain ozone after purgation until Mr. Swope's final exposure caused by that characteristic on July 10, 1996.[81]

The second argument begs the question and improperly inverts the analysis required by LPLA § 2800.57(B)(2). Simply put, the argument is that because of Columbian's extensive experience in making carbon black with a process using ozone, Columbian is a

---

[81] Moreover, as we read LPLA § 2800.57(A)and (B) together, the manufacturer is relieved of the duty of providing an adequate warning about dangerous characteristics at the time the product left its control only if the user or handler at that time already knew or reasonably should have been expected to know of the characteristic and its danger. We do not base our decision herein on this statutory nuance, however, because there is no evidence that Columbian ever acquired actual or constructive knowledge of the dangerous characteristic prior to Mr. Swope's exposure to ozone on July 10, 1996.

47

sophisticated purchaser and user of anything involving ozone in its business, and therefore Columbian should have been expected to know of the latent dangerous characteristic of the generator contradicted by Emery's safety instructions and representations. However, LPLA § 2800.57(B)(2) explicitly requires that the manufacturer, in order to be relieved of his duty to warn, prove that the user or handler of the product already knew or reasonably should have been expected to know of the product's dangerous characteristic.[82] Once this threshold burden of proof has been met, it may be plausible to find an implication in the statute that the purchaser becomes a sophisticated intermediary with an exclusive or concurrent duty to warn his employee users and handlers of the danger. But the statute plainly does not authorize courts to judicially notice or assume ipse dixit that a particular purchaser is a sophisticated intermediary with respect to a specific latent dangerous characteristic of a product. The argument begs the question because it "bas[es] a conclusion on an assumption that is as much in need of proof or demonstration as the conclusion itself."[83]

The record does not contain evidence of sufficient concrete facts to demonstrate that there is no genuine dispute that

_____

[82] La. Rev. Stat. Ann. § 9:2800.57(B)(2) (West 1997).

[83] Bryan A. Garner, A Dictionary of Modern Legal Usage 82 (1987).

48

Columbian should have known of the latent dangerous characteristic of the ozone generators it purchased from Emery. In fact, it is undisputed that these were the first ozone generators Columbian had ever purchased from Emery and that the vast majority of Columbian's experience had been with other makes and models of generators. Moreover, there is nothing in the record to suggest why even a highly experienced user or handler of ozone generators should have been expected to know that the particular Emery generators purchased by Columbian could not be safely and adequately purged in the manner prescribed by Emery. Just as an experienced trucking firm or its professional drivers might not be expected to anticipate an unusual hidden danger involved in a routine engine maintenance procedure, we see no reason in this record to believe that an experienced user of ozone generators should have been aware of the specific dangerous propensity of the Emery ozone generators to recycle and retain ozone even after following the manufacturer's prescribed purging procedure. Based on the present record, a reasonable jury could infer that a carbon black manufacturer in Columbian's position reasonably should not be expected to know that the Emery generators could not safely be purged according to Emery's own instructions and representations, although that manufacturer might reasonably be expected to know everything about how to use the ozone subsequent to its generation in its patented carbon

49

black manufacturing process.  There is nothing in the record to indicate that Columbian had ever made an ozone generator or had any occasion to delve into the intricacies of its internal operation.  Indeed, it is undisputed that Columbian had never dismantled or performed major internal maintenance on the Emery generators or had even opened anything on such a generator other than its outer door for the minor maintenance purpose of replacing glass dielectric tubes.  Mr. Jordan explicitly stated in his deposition that as far as he knew a "turnaround"[84] was never done by Columbian on an Emery ozone generator, and Mr. Bianchi confirmed that belief.  Mr. Bianchi testified that no periodic inspections or maintenance procedures were done on the Emery generators, other than the replacement of the glass dielectric tubes.

The cases cited by Henkel do not conflict with the foregoing analysis or require a conclusion that there is no genuine issue as to whether Columbian already knew or reasonably should have been expected to know of the latent dangerous characteristic of the Emery ozone generator despite Emery's inaccurate and inadequate safety instructions and representations.  For example, Henkel cites <u>Davis v. Avondale Industries, Inc.</u>[85] for the

---

[84] According to Mr. Jordan, a "turnaround" is "when we take a unit down and go through the complete unit and take a look at all of the equipment and do maintenance work on all of the equipment."

[85] 975 F.2d 169 (5th Cir. 1992).

50

proposition that "if Columbian was a sophisticated user. . . then the Henkel defendants owed no duty to warn Columbian or Swope. . . ."[86] In the present case, however, we do not reach the question of what would be the effect of Henkel having carried its burden of showing that Columbian was a sophisticated intermediary. We cannot do so because there is a genuine dispute as to whether Columbian already knew or reasonably should have known of "the *characteristic of the product* that may cause damage and the danger of such characteristic."[87] In <u>Washington v. Department of Transportation</u>, this court, in a harmless error analysis of an evidentiary ruling that was assumed to be erroneous arguendo, cited <u>Davis</u> and concluded that the manufacturer had no duty to warn because the purchaser-intermediary's representative testified he actually already knew of the pertinent danger.[88]

Henkel cites a number of cases that are inapposite because, among other reasons, they applied pre-LPLA law and did not involve alleged sophisticated intermediaries. All but one were decided after a full trial and not on a motion for summary

---

[86] Henkel Br. at 17.

[87] La. Rev. Stat. Ann. 9:2800.57(B)(2) (West 1997) (emphasis added); <u>accord</u> <u>Davis</u>, 975 F.2d at 172-75 (implicitly recognizing that this and related issues must be submitted to the jury with proper instructions if reasonable minds could differ, as the court in <u>Davis</u> evaluated the adequacy of a jury instruction on the "sophisticated purchaser" defense).

[88] 8 F.3d 296, 300 (5th Cir. 1993).

51

judgment.  Hines v. Remington Arms Co. is inapposite for the additional reasons that the court found de novo from the jury trial record that the trial court's exclusion of warning evidence was harmless because (a) the gunpowder manufacturer "provided ample warning of the flammability and danger of the product," (b) the plaintiff admitted he was well aware of the danger of firing a bullet into a container of gunpowder, and (c) the danger of pointing "a loaded high powered rifle at gunpowder, [is] well known and obvious to the ordinary consumer, especially one such as Hines, who is a sophisticated user of rifles and gunpowder."[89] The court's use of the term "sophisticated user" in Hines is not relevant to the present case.  In Todd Shipyards Corp. v. Hercules, Inc., this court held that the district court was not clearly erroneous in finding after a full trial that the defendant manufacturer adequately warned Todd of the application and limitations of the product, thermal barrier cloth.[90]  The purchaser and his employees admitted to having knowledge of the danger that the cloth could burn, and the defendant introduced expert testimony that this danger was common knowledge in the industry.[91]  The court's statement that the plaintiff was a "sophisticated user" was not especially meaningful or crucial to

---

[89] 648 So.2d 331, 337 (La. 1995).

[90] 859 F.2d 1224-25 (5th Cir. 1988).

[91] Id. at 1226.

52

the holding.  In <u>Ducote v. Liberty Mutual Insurance Co.</u>, the trial court found, after a full trial, that the manufacturer's warning that the electrical saw should be grounded while in use to protect the user from electric shock was adequate to warn an experienced carpenter of the danger of death by electrocution.[92] The trial court based its decision on a finding that the warning was adequate, not on whether the manufacturer had been relieved of a duty to warn; the use of the term "sophisticated user" in the appellate opinion was unnecessary and irrelevant.[93]  Finally, the court in <u>Scallan v. Duriron Co.</u>, applying pre-LPLA law, affirmed a summary judgment relieving the manufacturer of a duty to warn because the danger was obvious to an ordinary, not a sophisticated, user.[94]

Moreover, none of these cases presented an issue of whether there was a genuine issue of material fact for trial as to whether a purchaser already knew or reasonably should have known

---

[92] 451 So.2d 1211 (La. Ct. App. 4th Cir. 1984).

[93] <u>Id.</u> at 1215 ("Having determined that the trial court did not clearly err in finding that Skil Corporation's warnings were adequate, we must affirm the judgment.").

[94] 11 F.3d 1249, 1252 (5th Cir. 1994).  Although the court in <u>Scallan</u> does make mention of the term "sophisticated user," its holding is clear: "The danger inherent in pumping chlorine through a hydraulic pump is obvious to an ordinary user of hydraulic pumps, such as Allied.  Consequently, no genuine issue of material fact exists as to whether Duriron had a duty to warn that the pump should be fitted with an automatic sensing mechanism or used with an inert hydraulic fluid."  <u>Id.</u>

of the dangerous characteristic of a product so as to excuse a manufacturer's failure to provide an adequate warning.  All except one were decided after a trial, and the one was a case of summary judgment based on a danger obvious to an ordinary user.

## V. CONCLUSION

For the foregoing reasons, the judgment of the district court in favor of defendants, Columbian and Henkel, is REVERSED and the case is REMANDED for proceedings consistent with this opinion.